No. 92-465

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

IN RE THE PETITION OF
ROBERT G. STEELE

FILED

DEC 22 1993

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   ORIGINAL PROCEEDING

COUNSEL OF RECORD:

    For Appellant:

    Larry M. Elison, Attorney at Law, Missoula, Montana

    For Respondent:

    K. Paul Stahl, Attorney at Law, Helena, Montana

Submitted on Briefs:   August 5, 1993

Decided: December 22, 1993

Filed:

_____
Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Petitioner Robert G. Steele appeals from the final decision of the State Bar of Montana Committee on Character and Fitness (Committee) refusing to certify petitioner to this Court for admission to the State Bar of Montana. We affirm the decision of the Committee.

The sole issue presented is whether the Committee properly concluded that Mr. Steele is unfit to practice law in the State of Montana.

Robert G. Steele (Steele) submitted his application for admission to the State Bar of Montana on November 15, 1990, intending to take the February 1991 bar examination. On December 26, 1990, after a review of his Character and Fitness application, the Committee sent a letter to Steele advising him that it had "serious concerns" about his convictions for driving under the influence (DUI) and tax liens and requested that Steele provide the Committee with DUI records and dispositions, copies of Internal Revenue Service (IRS) deficiency notices and copies of his responses to the IRS.

The Committee also noted that Steele had applied to take the February 1991 exam but would not be graduating from the University of Montana School of Law until the spring of 1991. Steele was asked to submit a written explanation of why he had applied to take the February examination when he would not have fulfilled the graduation requirement until June. Steele responded by telephone

2

that he had applied for a faculty waiver for a required one-credit course which he had attempted to replace with an "independent study" project. He stated that he would not know until February 4, 1991, whether the faculty would grant his request for a waiver. After the faculty denied his request for waiver, Steele requested that the State Bar allow him to take the examination without meeting the graduation requirement and he was advised that this was not possible without permission from this Court.

On February 13, 1991, the Committee met to review Steele's application and decided not to certify Steele for the bar examination and admission due to the concerns previously noted. The Committee advised Steele that he could appear in person for an informal hearing regarding the decision. Steele accepted. The Committee's position did not change following the informal hearing.

The Committee was particularly concerned with Steele's interaction with the IRS. Steele is a Certified Public Accountant licensed to practice in Montana and is thus conversant with IRS regulations and procedures. Steele did not file timely personal income tax returns for tax years 1982 through 1986. With penalties and interest added, Steele's personal tax liability to the IRS was greater than $208,000 at the time of the informal hearing.

Steele provided an authorization for disclosure and waiver for the Committee's use in obtaining relevant information from the IRS. He also submitted numerous documents to the Committee demonstrating his tax protest activities in the early 1980s. Most of these documents consisted of correspondence to and from members of the

3

Montana Congressional delegation.

During the time between the request for the informal hearing and May 1, 1991, the date of the hearing, Steele made offers in compromise for his tax liability, offering slightly more than 1% in compromise of his federal and state taxes owed. At the hearing, Steele presented copies to the Committee of his written offers to these agencies and discussed his difficulties with the IRS in more detail:

> I have an offer and compromise that I mailed off to the federal government for all the back taxes. I don't know if they will accept this offer and compromise, but it's the first time that I have been able to offer anything. I am only offering what I can afford to pay here. I am in hopes that if they don't accept this offer, another one can be worked out. And here is the same thing with the state of Montana.

> I have sat down and I have talked to these people. I have met with the Internal Revenue agents. They understand. They have no gripe with me. As a matter of fact, they offered to -- They wanted me to go to work for them, and I have agreed to do work for them. They told me they will pay me for both my time and my expenses, and I have agreed to do that. I have to assume from that that they have a certain amount of trust in me as well.

Steele responded to additional questions from Committee members pertaining to his tax liability and his tax protest activities, including questions concerning his involvement with the Golden Means Society, a group which advocated not filing tax returns on the basis of constitutional rights and which no longer exists. He testified as follows:

> MS. BRANDBORG: In working with those people in the Golden Means Society, when people would come to you as an accountant and ask your advice, what type of advice were you giving, and did it essentially follow the same pattern that you followed in refusing to pay taxes?

4

MR. STEELE:  . . . We didn't refuse to pay taxes. We refused to file a return with the information that was on there. The answer to your question is, no, I didn't get into a professional advisory capacity, unless it was in the realm of my expertise in the tax law. And there was a lot of that, an awful lot of that.

In fact, I primarily was preparing tax returns for people who hadn't filed for a while. I was preparing these returns through their records and getting them up to date, currently.

I, myself, wanted to find out what basis there was to a lot of the constitutional challenges; and I wrote those letters and took those stances. "Example only," I wrote on the first return that I filed, requesting assistance; and I got quite a few answers from different senators that were encouraging our position at that time.

Steele testified that in 1987, after certain tax reform legislation was enacted, he finally filed returns for the years 1982-1986. He stated that after numerous tax court appearances, he was convinced that his tax protest methods were not going to work. He also testified that he felt his efforts had been helpful in changing the tax laws.

At the request of the Committee, Steele provided an authorization to disclose information about his income tax and "other matters" for tax years 1982 through 1990 and his permission to discuss an "Agreement to Assist IRS" with Larry Huggins, an IRS investigations officer from the Missoula IRS office. The District Counsel for the IRS in Montana responded in writing to the Committee's request for information, stating that the IRS opposed Steele's admission to the State Bar of Montana. The letter also stated that a memorandum had been circulated to IRS employees in Montana asking for their input regarding the request and that several memoranda were received in response from IRS employees who

5

had dealt with Steele and copies of such were attached to the letter. The Committee also was informed that Steele had never been employed by the IRS, but that he had agreed to work with the IRS in a special capacity and that he had provided such services to the IRS.

The letter noted the following about Steele's dealings with the IRS: (1) that he had been a member of the Golden Means Society which advocated violation of the tax laws; (2) that he failed to timely file income tax returns for tax years 1982 through 1986 and only filed them after entering law school; (3) that his tax liability was in excess of $200,000 and that he had made no effort to pay any of the taxes when he was earning a substantial salary as a CPA; (4) that he encourages his clients to ignore the IRS Examination Division during its audit procedures and to request conferences with the Appeal's Division without a meaningful audit and delays resolution of cases pending before the Tax Court until the eve of trial, a tactic which he apparently believes will obtain more favorable results for his clients; and (5) that his actions indicate that he does not believe he is required to follow the Internal Revenue laws of the United States.

One of the attachments to the letter stated that Steele had been the subject of two IRS criminal investigations in the 1980s, although each case resulted in a decision by the IRS not to prosecute. This was the first knowledge the Committee obtained about the criminal investigations. One of the criminal investigations, in which Steele was designated a co-conspirator

6

because of his affiliation with the Golden Means Society, concerned an alleged conspiracy to impede and impair the IRS in assessment and collection of taxes. Steele testified that he did not timely file the tax returns because a taxpayer under criminal investigation is not required to file returns until the investigation is resolved. Steele refused to voluntarily file tax returns other than "5th amendment constitutional" tax returns until his criminal case was resolved. The IRS does not consider these to be actual returns as they do not list income and deductions.

The second criminal investigation centered around Steele's failure to pay taxes due and owing for 1982 through 1986 after he filed the actual returns in 1987. Although the IRS suspected that Steele had transferred property and filed false financial statements with the IRS to preclude paying taxes, the IRS later determined that Steele had not falsified any documents or secreted away funds in order to avoid paying the IRS and that Steele had spent all his funds for personal reasons rather than making estimated tax payments. The revenue officer handling Steele's returns noted that she had "minimal cooperation" from Steele.

In a letter dated August 9, 1991, Steele responded to the information disclosed by the IRS. On August 23, 1991, the Committee provided formal notice to Steele by certified mail of its denial of certification for admission to the State Bar of Montana. The Committee stated the following as reasons for denial:

Unlawful conduct, as evidenced by your DUIs and your failure to pay taxes;

Making of false statements including omissions as shown

7

by your failure to disclose the IRS's criminal investigations of your activities;

Abuse of legal process as reported in IRS District Counsel's letter of July 26, 1991;

Neglect of financial responsibilities as shown by your tax liens; and

Neglect of professional responsibilities as evidenced by your failure to adhere to the tax laws even though you are fully aware of them in your capacity as a CPA.

Pursuant to the Rules of Procedure of the Committee on Character and Fitness, Steele formally responded to each of the five reasons given by the Committee for denial of certification and filed a Request for Reconsideration and Hearing.

A reconsideration hearing was held on March 5, 1992, to allow Steele to present evidence to support his application for admission. Prior to the hearing, Steele provided additional information to the Committee, including letters and affidavits in support of his application for admission and notice that his offer of compromise had not been accepted by the IRS. Steele also had a chemical dependency evaluation performed on September 19, 1991 and had the evaluation results forwarded to the Committee.

After the hearing, Steele was allowed to depose two additional IRS employees, submit additional interrogatories to one of the witnesses at the hearing and to submit other additional materials. On July 22, 1992, the Committee met to review Steele's application and again denied his application. Formal findings and conclusions were issued on August 24, 1992. Steele challenges several of the Committee's findings and conclusions.

Further facts will be provided as necessary throughout this

opinion.

Did the Committee properly conclude that Mr. Steele is unfit to practice law in the State of Montana?

The rules for admission to the State Bar of Montana provide that the burden of proof is on the applicant to demonstrate good moral character and general fitness to practice law in an appeal from a decision of the Committee on Character and Fitness of the State Bar of Montana:

> Every Applicant for the Montana Bar examination shall be of good moral character. The applicant shall have the burden of proving by clear and convincing evidence that he or she is possessed of good moral character. The Committee shall certify the Applicant to the Clerk of the Supreme Court unless prior or present conduct of the Applicant of which the Committee becomes aware would in the opinion and discretion of the Committee cause a reasonable person to believe that such Applicant would, if admitted to practice law in Montana, be unable or unwilling to act in accordance with the standards set forth in the Montana Rules of Professional Conduct, fairly, discreetly, honestly, reasonably, and with unquestionable integrity in all matters in which he or she acts as an attorney at law.

Rules of Procedure of the Committee on Character and Fitness (1991), Section 3(a) (as amended June 9, 1992); now Section 4(a) (amended March 25, 1993). The standard of review used by this Court in reviewing Committee decisions to deny admission and certification to take the Montana bar examination is as follows:

> Upon reviewing a final decision of the Character and Fitness Committee we will <u>conduct an independent review of the entire record to determine if the Committee erred</u>. When the facts are admitted and uncontested, as they are in this case, we will give due consideration to the inferences drawn by the Committee, including inferences concerning rehabilitation and mitigation. Consideration will be given to the recommendation of the Committee as to whether the applicant is of the requisite good moral character and fitness to be admitted to the Montana Bar.

9

> The Committee will have heard testimonial evidence and will have had the opportunity to observe the demeanor and judge the credibility of the applicant or other witnesses. However, inasmuch as we are designated by the Montana Constitution to ultimately make this decision, we will affirm the Committee's recommendation if we determine it was correct, and we will reverse if we determine the Committee erred. Our review will be in accordance with the existing standards for admission, taking into consideration the whole record.

In re the Matter of Matt (1992), 252 Mont. 345, 348-49, 829 P.2d 625, 626 (emphasis in original) (quoting In re the Matter of Pedersen (1991), 250 Mont. 325, 328-29, 820 P.2d 1288, 1290).

Although the Montana Constitution gives this Court exclusive authority to regulate bar admissions in Montana, such authority is subject to the limits imposed by the United States Constitution. The United States Supreme Court has held that, in making determinations of an applicant's character and fitness to practice law, the applicant must be afforded adequate due process of law. Willner v. Committee on Character and Fitness (1963), 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224. The Court stated in Willner, 373 U.S. at 107, 83 S.Ct. at 1182, 10 L.Ed.2d at 232:

> [I]n all cases in which admission to the bar is to be denied on the basis of character, the applicant, at some stage of the proceedings prior to such denial, must be adequately informed of the nature of the evidence against him and be accorded an adequate opportunity to rebut this evidence.

Steele contends that he was not afforded due process because he either did not receive notice of the Committee's bases for its decision, or he received notice after the hearings. He also contends that due process was not afforded him because supporting documentation was either absent or based on constitutionally

10

protected activities which Steele had engaged in prior to attending law school.

In support of his claim that he did not receive due process, Steele contends that the Committee did not identify the evidence against him; specifically, the Committee did not identify or allow him to address omissions in his application and did not identify any false statements, even in the final decision. He also claims that the Committee did not follow consistent rules of evidence.

We first note that the Committee is not bound by formal rules of evidence and

> may, in its discretion, take evidence in other than testimonial form, having the right to rely upon records and other materials furnished to the Committee in response to its request for assistance in its inquiries. The Committee may, in its further discretion, determine whether evidence to be taken in testimonial form shall be taken in person at the hearing or upon deposition, but all testimonial evidence shall in either event be taken under oath. A complete stenographic record of the hearing shall be kept, and a transcript may be ordered by the Applicant at the Applicant's own expense.

Rules of Procedure of the Committee on Character and Fitness, Rule 5(i) (March 25, 1993).

Steele's objection here seems to center around the evidence supplied by IRS employees as previously set forth in this opinion; he states that their "inability to specify either because of confidentiality or lack of memory leaves . . . Steele in an informational and evidentiary wasteland." Therefore, Steele claims that the Committee's findings should identify the portions of the record which the Committee relied on to support each finding to prove that it did not rely on improper evidence. Because of the

11

independent character of our review, such detailed fact-finding is unnecessary. From our review of the entire record, we find evidence to support the Committee's findings as set forth in the following discussion.

One of the reasons for denying Steele's certification is that Steele made false statements in his application. False statements include omissions. Thus, Steele's argument that the Committee failed to identify any actual false statements is not relevant. We focus on the omissions in Steele's application.

The application form asks the applicant to list any civil proceedings in which the applicant has been a party. In answering this question, Steele disclosed that he had sued a client in 1978 for nonpayment of a fee for professional services, yet he did not disclose a more recent civil suit against the IRS which had proceeded to the Ninth Circuit Court of Appeals. More importantly, Steele did not inform the Committee about two criminal investigations that the IRS had initiated against him in the 1980s. Moreover, despite providing the Committee with a two-inch sheaf of paper after the Committee inquired into his dealings with the IRS, Steele continued to withhold information about the criminal investigations. The Committee found out about the criminal investigations from the information disclosed by the IRS after the informal hearing.

Steele contends that because the application for admission did not specifically request him to list any known criminal investigation, it cannot be an omission to fail to include that

12

which is not specifically requested. However, the application does require an applicant to disclose <u>any other information not already given having a bearing on character and fitness</u>. Furthermore, this request is conspicuously located above the applicant's signature line. It would be impossible for the application to ask every conceivable question which would cover the conduct of every applicant. That is one of the reasons for the general query into any other information having a bearing on character and fitness.

Steele also claims that since he identified the IRS investigator, Larry Huggins, as a person with whom he had been in contact, the Committee could then easily find out about the criminal investigations. Steele's reference to Huggins was included in the following written response to a question on the application asking if there are any unsatisfied judgments outstanding against the applicant:

> I am delinquent on income tax payments. I am current on return filings but owe on past amounts due. This is because I filed late for the years 1982-1986 in 1987. My original returns for those years were protest returns. This was because, in my practice as a CPA, I became aware of severe problems with the income tax system. Some of these problems, as to fairness, have been corrected by Congress in the 1986 Reform Act. I believe that my efforts contributed to the reasons for the mandate President Reagan gave Congress to reform the Income Tax System.
>
> Nevertheless, I realize that the taxes are due, owing, and should be paid. I am in contact with Mr. Larry Huggins, IRS Missoula, (406) 329-3681. It is my intention to begin to pay these taxes as I return to the full-time work force after law school. I have provided IRS with financial statements and Mr. Huggins seems to be satisfied that this plan will work.
>
> A contributing factor to not being able to pay these taxes is that I lost all my Capital in the Stock Market

13

about 1983. While this has diminished by ability to pay, it has not helped the tax problems because Capital losses are only allowed to offset ordinary income to the extent of $3,000.00 per year. They are also not deductible for self-employment tax purposes. I have learned however, that IRS has a compromise procedure for situations like this and I intend to utilize that procedure as soon as I have something to offer. The total amount due, both to State and Federal, currently approximates $150,000.00, including penalty and interest. A large portion of this would be currently dischargeable in bankruptcy. I do NOT intend to resort to bankruptcy since the debt is a legitimate result of a mistake I made.

The mistake, however, was instrumental in my decision to enter Law School. I believe that I am now equipped with an understanding of law and taxes to allow me to assist clients in this area where few attorney's [sic] wish to specialize. The IRS is no longer an enemy but rather an agency in need of guidance from a Congress enlightened by attorney's [sic] with knowledge and experience in this realm. A system of taxation that meets the needs of our government and yet inflicts the least intrusion into the lives of those who pay it should be the goal of congress. A populace with the expertise available to help them function within this system is the foundation to make it work. My goal is to help stabilize this foundation. In this respect, I pledge to be a better example in the future.

This statement is not a candid disclosure of the extent of Steele's tax difficulties. Although it provides Huggins' number, it omits any mention that Huggins investigated Steele for criminal conduct. Further, it states that Steele lost his capital in "about 1983," but it does not explain why Steele did not attempt to preserve funds after that time for future payment to the IRS.

Steele further argues that the following finding of fact was not material:

11. The Applicant applied to take the February, 1991, exam, even though he was not eligible; to become eligible he had to receive a waiver from the faculty. Applicant made no mention of his conditional application until the issue was raised by the Administrative Assistant to the Committee.

14

The record contains a memorandum written by Jan Weber, the Administrative Assistant to the Committee, on December 26, 1990, after questioning Steele about his eligibility to take the exam. It also contains other memoranda indicating that, after Steele learned that he would not graduate until spring semester, he inquired whether he could still take the exam and was advised that this would require permission from this Court. While this omission by itself may not be a serious omission under the particular circumstances of this case, it is cumulative and, therefore, it becomes material.

We conclude that Steele was adequately informed of the nature of the evidence against him and was afforded an adequate opportunity to rebut the evidence. He knew from the time of the Committee's first letter, dated December 26, 1990, that the Committee had concerns about his tax liens and DUIs. After further communication with Ms. Weber and the Committee, Steele knew the Committee was concerned about his ineligibility to take the February examination, he knew the Committee was concerned about his problems with the IRS and he knew the Committee was concerned about the civil case which he had not disclosed. After the Committee inquired into the tax lien matter, other information from the IRS was disclosed and Steele was questioned about this information. He responded to all these concerns either informally or formally. He had access to and reviewed the Committee's complete file. Steele was given adequate opportunity to explain and rebut the evidence.

We conclude that the materiality of the omissions was

15

significant. Furthermore, Steele did not facilitate information gathering about his dealings with the IRS either in his testimony before the Committee or in other numerous communications with the Committee. The Committee determined that Steele "was neither candid in his application nor before the Committee." The record fully supports this finding. The record also establishes that the Committee gave Steele every opportunity to present evidence and that it treated Steele fairly throughout the post-denial process.

Throughout this proceeding, however, Steele's conduct demonstrates an attempt to make light of or to downplay the significance of the facts relating to his tax protest activity, his failure to pay taxes and his interaction with the IRS. In our view, this is a significant basis for the Committee's finding that Steele was neither candid in his application nor before the Committee. The Committee also had the advantage of personal observation of Steele and other witnesses to determine the candor and credibility of each.

In addition to finding that Steele had made "false statements including omissions," the Committee made a number of additional conclusions with regard to the filing of tax returns and payment of taxes for the years 1982 through 1986. These findings showed that Steele owed the IRS more than $209,000 and had made an offer of compromise of $3,544; similarly, he owed the State of Montana $20,824 and had made an offer of compromise of $381. The Committee found that Steele had never denied the tax was due and owing, that the money which he had for payment of the tax was spent otherwise

16

and that he acknowledged this was a violation of the law. The key conclusion in paragraph seven was that the behavior showed lack of reasonableness, neglect of financial responsibilities and neglect of professional obligations as an accountant. Following are the conclusions of the Committee on this aspect:

> 5. The Applicant failed to pay taxes for years 1982, 1983, 1984, 1985, and 1986. Applicant presently owes the [IRS] more than $209,000; he made an offer of compromise to the IRS of $3,544, slightly more than one percent of the amount owed. Applicant presently owes the State of Montana Revenue Department more than $20,824; he made an offer of compromise of $381, which is slightly more than one percent of the amount owed. These offers in compromise were made April 30, 1991, after the Committee made inquiry. The Applicant never denied that the tax was due and owing; money available to pay a portion of the tax was spent otherwise. Applicant further acknowledged this was a violation of the law . . .
>
> 6. Applicant admitted that failure to pay the tax and failure to file income tax returns were violations of IRS regulations.
>
> 7. Money available for payment of taxes was spent by the Applicant. Such behavior shows lack of reasonableness, neglect of financial responsibilities and neglect of professional obligations as an accountant. Applicant was more than 35 years of age and had been employed for more than 15 years as an accountant.
>
> . . .
>
> 13. Applicant's actions in application, hearings, and gathering evidence, show him to be a person of questionable integrity. He shows neglect of financial responsibilities, neglect of professional responsibilities, and has made false statements including omissions. Based on Applicant's omissions in the application process and on the evidence adduced in the hearings process, the Committee finds that the Applicant lacks sufficient moral character and if admitted to the practice of law would be unable or unwilling to act in accordance with the standards set forth in the Montana Rules of Professional Conduct, fairly, discretely, honestly, reasonably, and with unquestionable integrity.

17

Steele contends that the Committee based these findings in part on constitutionally protected activities which he had engaged in prior to attending law school. He argues that the Committee could not base any part of its decision on his exercise of free speech for speaking out against the IRS and the income tax laws, that it could not base any part of its decision on his association with the Golden Means Society because of his right of freedom of association, and that it could not base any part of the decision on his right of freedom of assembly for his presence in a group of persons assembled to protest the foreclosure of a family store. We find no evidence that the Committee considered any of these activities in making its decision except to the extent that Steele omitted information on his application or to the extent that he was not candid in discussing them.

From our review of the record, we affirm the conclusions with regard to the nonpayment of taxes, the offers in compromise, and the other essential elements as above-quoted. From the record it is somewhat difficult to determine if Steele acknowledged that his conduct was a violation of the law. Unfortunately Steele did not give straightforward answers to questions asked by the Committee. Following is a portion of his testimony:

> MR. SULLIVAN: Let me ask you: Did you actually sit down and keep figures for your income, for deductions, and compute what a tax would have been in 1982?
>
> MR. STEELE: No, I did not do that.
>
> MR. SULLIVAN: Why is that?
>
> MR. STEELE: I believed that would never be

18

necessary. I believed it was all going to change. I believed that the IRS was going to see the error of their ways and we were going to have a new tax system.

MR. SULLIVAN: And you believed that the government was not going to seek to collect what they felt was your legitimate tax due and owing for 1982 on through those years?

MR. STEELE: I believed that at some time there would be a settlement. You know, at the time, I was prepared to lose; and at that time, I had some money and I was investing at that time. At that time, I always had an open mind. If they could show me where we were wrong and convince me that we were wrong, I was willing to file the return; and I had the money at that time to pay it.

MR. SULLIVAN: Maybe my question isn't very clear. I get the impression that back then you felt that it was an invasion of privacy to provide all of this information about your earnings and your deductions, but I am a little unclear. Are you saying it was a violation of the constitution to tax you?

MR. STEELE: Of course not.

MR. SULLIVAN: So did you set aside any money to pay tax, or is it your position that you owed no tax?

MR. STEELE: No, no, no. We were wanting a better form of taxation; not no taxes. I mean, that's ridiculous. A flat tax, like it's been proposed, a national sales tax, something like that, that wouldn't be an intrusion into privacy. [Emphasis supplied.]

I had the money. I didn't put it in a trust fund and keep it aside for the IRS, and I eventually ended up losing most of that money in my investments. At that time, it was not a problem with me that I was going to have to pay these taxes, pay some taxes of some kind.

While the record is not as clear as it might be as to Steele's acknowledgement that this conduct was a violation of the law, we conclude there is sufficient evidence to support that conclusion and the further conclusion that Steele admitted that the failure to file tax returns was a violation of IRS regulations.

The emphasis in the above quote illustrates the difficulty of

19

obtaining a direct answer from Steele. In addition, from the above testimony it appears that Steele did not intend to pay the tax owed but intended to settle or "compromise" with the IRS at some future point.

When the first criminal investigation was resolved, Steele filed tax returns for the years 1982 through 1986. Because Steele did not keep records of income and deductions for tax purposes, his tax liability is based only on estimated income for those years.

The second criminal investigation related to the IRS's suspicion that Steele had transferred or hidden assets in an attempt to avoid paying the tax due after he finally filed the returns. The IRS did not prosecute this either because it could not determine that Steele had acted improperly.

The record demonstrates that Steele neglected both his financial and professional responsibilities. The record also demonstrates that at the time he was refusing to pay taxes, Steele did intend to effect some sort of a compromise for the years in question. The record does not disclose any willingness on the part of Steele to pay the full amount of taxes owed for the years 1982 through 1986. As a CPA, Steele was and is aware of the tax laws and the procedures required in connection with the filing of returns and payment of taxes. We affirm the findings and conclusions of the Committee as above set forth indicating a neglect on the part of Steele of both financial and professional responsibilities.

We have reviewed the entire record according to the standards

20

set forth in <u>Pedersen</u> and in <u>Matt</u>. We conclude that the record supports the decision of the Committee. We further conclude that Steele was afforded due process. We hold that Steele is unfit to practice law in Montana.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

21

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion. After a review of the entire record provided by the Committee for Character and Fitness, I conclude that the Committee erred when it denied Robert Steele's application to take the State Bar Examination.

Specifically, I conclude that those findings of fact relied on by the Committee to support its denial of Mr. Steele's application either lacked sufficient specificity so that they can be reviewed, or are unsupported by substantial evidence.

The Committee's Finding No. 5 to the effect that Steele acknowledged violating the law is incorrect. While it is true that one member of the panel examined him at length for the purpose of establishing that he knowingly violated the law, it is clear from that examination that the panel member did not understand Steele's responses. In sum, Steele testified that he did not file tax returns during the early 1980s because he was under criminal investigation. He had money with which to pay his taxes during those times, but based on his interpretation of the law, concluded that he would not owe any taxes. When the investigation was concluded, he filed a tax return. However, by then, the money with which to pay the taxes owed had been lost due to poor investments. Steele never stated that his failure to pay the taxes was a violation of the law. The whole point of his testimony was that he did not believe the amount was due, and that the law did not require that he file tax returns because he was under criminal investigation by the Internal Revenue Service.

22

Steele admitted that failure to pay taxes if a taxpayer acknowledged that they were due, and failure to file income tax returns if a taxpayer had no legal excuse for not doing so, would be violations of the law. But he vigorously denied that either circumstance pertained to him during the times that he failed to pay taxes or file returns. Therefore, the Committee's Finding No. 6 is taken out of context, distorts the essence of his testimony, and is also clearly erroneous.

In Finding No. 7, the Committee stated that because Steele no longer has the money available with which to pay his taxes, he was financially and professionally irresponsible. Unsuccessful investments are not the equivalent of financial irresponsibility, and it is peculiar that members of this profession would find him professionally negligent as an accountant when he has never had a similar complaint filed against him, nor has he ever been disciplined as an accountant.

The Committee's Finding No. 8 states that Steele was neither candid in his application nor before the Committee. I find no indication in the record that Steele lacked candor during his testimony before the Committee. Furthermore, since the Committee's finding lacks any specificity and provides no example of Steele's lack of candor, I conclude that it is insufficient as a basis for denying his application to take the bar exam or be admitted to a profession for which he has studied for over three years.

The Committee's Finding No. 9 states that Steele failed to disclose his suit against the United States on his application for

23

certification. While that may be true, it is hardly a material basis for denying his application. Steele filed the suit and prevailed in the suit, and it had absolutely no adverse bearing on his moral character or general fitness to practice law. Furthermore, all materials relating to the suit were fully provided to the Committee at their request prior to the time any decision was rendered. This finding does not support the Committee's conclusion that Steele was unfit to practice law.

In its Finding No. 10, the Committee stated that in spite of its requirement that Steele disclose information bearing on his character and fitness, he failed to identify two criminal investigations conducted by the IRS. However, neither criminal investigation resulted in any charge that Steele violated any law or federal regulation. Neither did any investigation lead to any complaint that Steele violated any professional rules established for certified public accountants. How then did either criminal investigation have any bearing on Steele's fitness or character? Have we established a new presumption in our law that because someone is investigated, that investigation provides evidence of unfitness or poor character? If so, then this opinion reflects a major change in the traditional principles of justice to which our courts have previously subscribed.

In its Finding No. 11, the Committee stated that Steele applied to take the February 1991 exam, even though he was not eligible. However, the record indicates that when Steele made application to take the February bar exam he thought he would be

24

eligible. When he filed the application, he indicated that he was still attending law school. All applicants for the bar exam anticipate their graduation date. Developments subsequent to Steele's application required that he take one additional course, which he did. This unforeseen series of events has no bearing on his fitness to practice law.

Other than these findings, there is no factual basis in the Committee's decision for denying Steele's application to practice law. Since I conclude that these findings are either unsupported by the evidence, or are inadequate bases for denying his application, I dissent from the majority opinion and would reverse the Committee's denial of Steele's application to take the bar exam and, if successful, subsequently practice law in the State of Montana.

Steele has been a certified public accountant for 20 years. During that time, he represented many clients to their satisfaction. Because of his political and legal beliefs, he has been investigated by the IRS on two separate occasions, and has been involved in civil litigation with the IRS on one occasion. In spite of those investigations, he has never been charged with a crime, nor even accused of a crime. He has never been found to have committed any ethical violation nor charged with any ethical violation. In the only civil litigation in which he was involved, he prevailed, and it was determined that the government owed him money.

25

It is true that because of his poor investment history and misjudgment about his legal obligations, he now owes a substantial debt to the federal and state governments. However, that debt continues to be his obligation and will presumably be enforced by the government to its satisfaction. It does not disqualify him morally or render him unfit to take the bar examination. Steele is being denied the opportunity to practice the profession for which he has prepared for over three years because of unconventional political ideas and incorrect legal conclusions drawn prior to his admission to law school. To forever deny him the opportunity to practice a profession for which he is otherwise qualified based on these past mistakes is a substantial injustice.

_____
                    Justice

Justice Karla M. Gray joins in the foregoing dissent.

_____
                    Justice

26

December 22, 1993

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Robert G. Steele
P.O. Box 7981
Missoula, MT 59807

Larry M. Elison
Attorney at Law
1101 W. Greenough Drive
Missoula, MT 59802

Annie M. Bartos, Chair
Character & Fitness Committee
P.O. Box 1051
Helena, MT 59624

Barbara Bell
Character & Fitness Committee
9 Third St. No. #201
Great Falls, MT 59401

Betsy Brandborg
Character & Fitness Committee
6582 Canyon Ferry Road
Helena, MT 59601

Robert J. Sullivan
Character & Fitness Committee
P.O. Box 9199
Missoula, MT 59807

Michael Tolstedt
Character & Fitness Committee
P.O. Box 849

Billings, MT   59103

K. Paul Stahl
Character & Fitness Committee
415 Hayes
Helena, MT   59601

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy