663 A.2d 1309

In the Matter of the Application of William H. HYLAND,
Jr., for Admission to the Bar of Maryland.

Misc. No. 41, Sept. Term, 1994.

Court of Appeals of Maryland.

Aug. 29, 1995.

522

William H. Hyland, Jr., pro se.

No argument on behalf of respondent.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RAKER, Judge.

Applicant seeks admission to the Bar of Maryland. We must decide whether the applicant presently possesses the requisite moral character to justify his admission.

The applicant filed an application for admission to the Bar on July 1, 1993, and passed the July bar examination. On his application, he disclosed that in 1986 he was convicted of fifteen counts of failure to file state sales tax returns [1] arising

<hr>

1. The applicant disclosed on his application and indicated to the Board that his conviction was for failure to file sales tax returns. Pennsylvania court records and a memorandum from the Office of Attorney General, Criminal Investigation and Prosecution Section for the Com-

from his operation of a restaurant in Philadelphia, Pennsylvania. He also disclosed that he had failed to pay Federal payroll withholding taxes in connection with the same restaurant operation.

Rule 2 of the Rules Governing Admission to the Bar of Maryland requires every applicant to file with the State Board of Law Examiners ("Board") an application that includes an authorization for release of confidential information pertaining to character and fitness for the practice of law to a Character Committee ("Committee"), the Board, and this Court.[2] If the Board determines that the applicant meets the pre-legal education requirements, the Board is required to forward the character questionnaire portion of the application to a Character Committee created by Rule 17. Rule 2(d).

Upon receipt of the character questionnaire, the Character Committee is required by Rule 5(b) to interview the applicant, verify the facts contained in the questionnaire, contact the references, make any further investigation it deems necessary or desirable, and then evaluate the applicant's character and fitness for the practice of law. The Committee shall then transmit to the Board a report of its investigation and a recommendation as to the approval or denial of the application for admission. If the Committee concludes that there may be grounds for recommending denial of the application, it shall notify the applicant and schedule a hearing, on the record, affording the applicant the right to testify, present witnesses and to be represented by counsel. Rule 5(b)(2). After the hearing, the Committee is required to transmit a written report to the Board and the applicant containing findings of fact on which its recommendation is based and a statement supporting the conclusion. Rule 5(b)(2).

---

monwealth of Pennsylvania, indicate, however, that the applicant was convicted on fifteen counts of failure to remit sales taxes.

**2.** All citations to Rules are to the Rules Governing Admissions to the Bar of Maryland.

Rule 5(c) provides that if the Board concludes that there may be grounds for recommending denial of the application, the Board must "afford the applicant the opportunity for a hearing on the record made before the Committee." If the Board decides to recommend denial of the application, it shall give the applicant the opportunity to withdraw the application. Rule 5(c). If the applicant decides not to withdraw the application, this Court "shall require the applicant to show cause why the application should not be denied." Rule 5(d).

Rule 5(a) sets forth the burden of proof in these proceedings:

> The applicant bears the burden of proving to the Character Committee, the Board and the Court the applicant's good moral character and fitness for the practice of law. Failure or refusal to answer fully and candidly any question set forth in the application or any relevant question asked by a member of the Character Committee, the Board, or the Court is sufficient cause for a finding that the applicant has not met this burden.

The applicant submitted his application for admission to the Bar in accordance with this procedure. Pursuant to Rule 5, his application was referred to the Character Committee for the Eighth Judicial Circuit. After a hearing on February 24, 1994, the Committee unanimously determined that the applicant had met his burden to prove that he possesses the requisite moral character and fitness to practice law and, accordingly, recommended that the applicant be admitted to the Bar. The Committee concluded that the applicant "has accepted responsibility for the non-payment of the Pennsylvania sales tax and the Federal withholding taxes." The Committee further found that

> [w]ith respect to the Pennsylvania tax liability, [applicant] served the required time in jail and has fully paid the taxes owed. Although the Federal tax liability is still outstanding and represents a considerable sum, [applicant] has con-

firmed that, when gainfully employed, he intends to make serious efforts to discharge this obligation.

*      *      *      *      *      *

[Applicant] appears to be a mature and sincere individual. He recognizes and appreciates his lack of judgment in failing to pay in a timely and diligent manner the Pennsylvania state sales taxes and the Federal withholding taxes during the ownership of his restaurant.

Noting that eight years had passed without any repetition of this conduct or similar conduct by the applicant, his honorable service in the California legal community during and following law school and his successful completion of law school, the Committee recommended the applicant be admitted to the Maryland Bar.

The State Board of Law Examiners then held a hearing on the matter, pursuant to Rule 5(c). The applicant testified before the Board but presented no witnesses. A majority of the panel, with two members dissenting, recommended that the applicant not be admitted to the Maryland Bar. The majority of the Board concluded that

the applicant had failed to demonstrate the financial responsibility and integrity which are key elements of the character and fitness necessary for admission to the Maryland Bar. The applicant supplied ample evidence in his testimony that he does not appreciate the seriousness of the pattern of activities which gave rise to these proceedings. Troubling issues of candor and credibility are raised by much of his testimony.

The Board identified specific evidence of these deficiencies in its report to this Court. The Board found that 1) the applicant's testimony before the Board substantially contradicted material elements of his testimony before the Character Committee, 2) the applicant's testimony before both the Character Committee and the Board included inconsistencies and hedged or evasive statements, and 3) the applicant failed to provide clear and convincing evidence that he presently possesses the

good character and fitness necessary for admission to the Maryland Bar.

The applicant elected not to withdraw his application. Pursuant to Rule 5(d)(1), we scheduled a hearing requiring the applicant to show cause why his application should not be denied.

I.

The applicant was born on October 15, 1950, in Philadelphia, Pennsylvania. He graduated from high school in 1968 and attended one semester of college before enlisting in the United States Air Force. Following an honorable discharge from the military, he returned to college and received a Bachelor's degree in 1977. He worked as a manager for several Philadelphia restaurants from 1978 to 1989. Thereafter, he attended law school in California and, in 1993, became a member of the Bar of that State. He applied for admission to the Bar of Maryland on July 1, 1993, and passed the July 1993 bar examination. Final action on his application was deferred pending investigation of his moral character.

The applicant pled guilty in the Court of Common Pleas of Dauphin County, Pennsylvania, on January 23, 1986, to fifteen counts of failure to remit sales taxes in violation of Pennsylvania state law. The Commonwealth nolle prossed fifteen other counts. The applicant also failed to remit to the federal government employee income tax withholdings in the mid–1980's and owes the Internal Revenue Service approximately $125,000, composed of principal, penalties, and interest.

The applicant's criminal conviction and related tax problems arose out of his management of the Hoffmann House, a restaurant in Philadelphia, Pennsylvania. In December 1979, the applicant and his father collaborated to purchase the restaurant, which was under bankruptcy protection at the time. Although the applicant's father was the sole owner of the shares of the restaurant corporation, the applicant was solely responsible for managing the operations of the restaurant, including all bookkeeping, tax filings, and payments.

The applicant was required to remit monthly sales taxes to the Commonwealth of Pennsylvania and quarterly employee income tax withholdings to the Internal Revenue Service. He filed the tax returns and remittances when the restaurant was profitable in the early 1980's; thereafter, however, business at the restaurant declined. As revenues declined, the applicant failed to remit the sales taxes and corporate tax to Pennsylvania and the employee payroll withholding taxes to the I.R.S. and, eventually, he stopped filing tax returns.

Following an audit of the restaurant records for the tax years 1983 to 1985, Pennsylvania authorities notified the applicant of the amount of sales taxes due and of the criminal penalties for failure to pay these taxes. He received notices of delinquency from Pennsylvania and the I.R.S. but ignored them; he explained that he hoped that business would improve in the future and enable him to bring the tax accounts current.

He was arrested and charged with criminal violations of the state code. In a written narrative that he submitted to the Board in support of his application, he explained:

Although the State continued to give me notice of the criminal penalties for failure to file, I ignored their warnings as bureaucratic paper shuffling. I was, unfortunately, mistaken in my belief.

\*        \*        \*        \*        \*        \*

I don't wish to make any excuses for my improper actions while owner and manager of the Hoffmann House. Looking back on those years, I realize I was simply overwhelmed by the daily activities of the restaurant business. In addition to acting as manager, responsible for all bookkeeping and accounting, I was the chef of the restaurant, cooking both lunch and dinner, six days a week. When the business turned out to be unprofitable, I was unwilling to face the obvious fact that the restaurant should be closed.

On January 23, 1986, he pled guilty in the Court of Common Pleas of Dauphin County, Pennsylvania, to fifteen counts of the misdemeanor offense of failure to remit sales taxes from

May 1983 through July 1984. He was sentenced to four to twelve months in Dauphin County Prison, Harrisburg, Pennsylvania, and was paroled because of prison overcrowding after serving forty-five days. He successfully completed probation, which required the payment of $19,365 in restitution for delinquent sales taxes.

The Internal Revenue Service did not institute criminal proceedings but instead assessed penalties against the applicant for failing to remit employee income tax withholdings in the mid–1980's. In the late 1980's, the I.R.S. attempted to collect the debt through tax liens and wage garnishments. According to the applicant, the I.R.S. considers this debt "uncollectible" pending his full-time employment and the scheduling of a payment plan. At the time of the hearing before the Board, the applicant's debts exceeded $199,000, including roughly $125,000 due to the I.R.S.; $13,754 due to the Commonwealth of Pennsylvania; $54,703 due to the Student Loan Marketing Association; and approximately $6,000 in credit card debt.

The applicant graduated from Western State University College of Law, located in San Diego, California, on December 20, 1992 and received a degree of Juris Doctor. During these years, he served as an unpaid intern in the San Diego Superior Court pre-trial services unit, the San Diego Public Defender's Office, and the San Diego City Attorney's Office. After graduation from law school and admission to the Bar of California, the applicant never worked full-time. His explanation for why he did not work was the poor job market and his expectation of moving to Maryland. While waiting for his California bar results, he was a law clerk for an attorney and, after his admission to that Bar, he continued to handle some of her cases. He performed volunteer legal services and represented a few clients, but he did "not establish a strong practice in San Diego because [he] felt that it was ethically improper to be taking on clients and then to ... pass them on to another attorney." He financed his practice primarily through debt and, in 1993, earned about $3,000. During the time he lived in California, he had no bank account in his name. In 1994, the

applicant and his wife moved to Maryland. At the time of the hearing before this Court, he was employed as a bartender in the District of Columbia.

The applicant identifies several aspects of his life since his incarceration that he believes are evidence of his rehabilitation and present good moral character. He states that he was a successful manager at the White Dog Cafe in Philadelphia from August, 1987 to August, 1989. He emphasizes his commitment to practice law and his hope that a legal career will provide him with the means to repay his debts. He mentions his nomination as a teaching assistant in law school and the experiences he gained working in several legal internships. He notes his membership in the California Bar and his performance of volunteer legal services. Finally, he highlights the stabilizing effect of his marriage and the positive character recommendations that he has received from the White Dog Cafe, his internships, and a colleague in California.

## II.

The hearings before the Character Committee and the Board focused on the applicant's failure to remit the taxes, his failure to reduce his obligation to the I.R.S., and the question of his financial responsibility. The Board found that the applicant's testimony before both panels included material inconsistencies and evasive statements. We have reviewed the entire record and agree with the conclusions of the Board.

The applicant offered several explanations for his failure to remit the taxes and stated that he never thought he would get away with not paying them. Before the Board, he referred to the choices he faced when business at the Hoffmann House began to decline: "What I chose to do is honor my obligation to those who provided goods and services to the restaurant knowing fully that I was still obligated to pay back the taxes that I owed.... [I]t was the honorable and most moral" choice. Before the Committee, he indicated that operating the restaurant was "quite strenuous" and that the taxes were easy to disregard: "I was completely overwhelmed and tended to

ignore that which made the least noise. If they didn't bother me, I didn't bother them. I didn't send them money and they didn't bother me anymore, and I felt that things were okay." In his view, Pennsylvania and the I.R.S. could recover their money from the equity in the restaurant.

The Board concluded that the applicant's testimony was confusing and contradictory on material elements. As examples, the Board cited the applicant's conflicting explanations before the Committee and the Board as to the amount of restitution paid to Pennsylvania to satisfy the sales tax obligation and the source of the monies. He told the Committee that *he* made restitution of the sales taxes from the proceeds of the sale of the Hoffman House in the amount of $30,000 and that nothing more was owed to the Commonwealth of Pennsylvania. He told the Board, however, that the $19,365 in restitution was paid by his father. Contrary to what he told the Committee, the applicant produced for the Board a statement from the office of the Pennsylvania Attorney General indicating that, as of July 27, 1994, there was an outstanding liability in the amount of $13,754 attributable to the Hoffman House. Moreover, the Attorney General document reflects that the account has been referred to a collection agency, which is only done when the Department of Revenue can no longer locate the operator.[3]

The Board found the applicant's testimony conflicting and ambiguous as to whether there was any equity in the Hoffmann House. The applicant's testimony with respect to the amount of equity in the restaurant was significant because he told the Committee that he satisfied part of the debt obligations from the equity. The Board found, however, that

[i]f there were proceeds from equity in the restaurant, it remains unclear as to how much was involved ($30,000 or $19,000 or nothing?) and what happened to the money.

---

3. At the hearing before this Court, the applicant indicated that the referral of his account to a collection agency was not warranted. He said that the Department of Revenue should have been able to locate him because his father maintained an address in Philadelphia.

The Board was very concerned about the applicant's attitude toward his debts and concluded that the applicant's failure to work for pay was to avoid garnishment. His testimony before the Committee suggested that the I.R.S. was successful in obtaining some substantial tax payments through garnishment. The I.R.S. documents he presented to the Board, however, do not support this testimony. Rather, it appears that the I.R.S. was unsuccessful in using garnishment to reduce significantly the applicant's tax debt.

The Board found that the I.R.S. documents show no transactions for the period from August 1987 to August 1989 which reflect garnishment of the applicant's wages at the White Dog Cafe. The Board found that the documentation presented at the hearing "suggests that the applicant apparently stopped working at the White Dog Cafe before the I.R.S. collected any significant amount by garnishment." The Board concluded that

[c]omparing the applicant's testimony before the Character Committee and the Board with the I.R.S. documentation he submitted to the Board creates an uncertain picture of the impact of the garnishment. The only thing that seems clear is that the applicant left Pennsylvania for law school in California in large measure to escape the garnishment.

The Board also found that the applicant showed no commitment to pay the full amount of his debt to the I.R.S., which, at the time, amounted to about $114,000 and was accruing interest at twelve percent a year. Although the applicant testified before the Board that he intended to pay his entire I.R.S. debt, in describing the status of the debt, however, he recanted this commitment:

A. It's—in their words the status is uncollectible. They're evaluating my full-time employment and there will be an offer of compromise with that.

Q. You don't intend to accept that offer of compromise because you're going to pay it all in full, right?

A. I'll probably listen to what they have to say.

Q. Well, then when I asked you whether you intended to pay back the entire $114,000 with interest at twelve percent—

A. Okay, *I misstated that.* I would—I plan to take care of that obligation through whatever means I can with the I.R.S.

(Emphasis added.)

The applicant's employment history since his conviction provides little support for his assertion that he intends to pay fully his government debt. During the period when the applicant attended law school, from August 1989 through December 1992, he was not employed and he financed his education mainly through loans. During this time, he did not work "because the income I would have received would have gone directly to the I.R.S. and I would not have derived it personally as income." As a further explanation for his unemployment, he also cited academic pressures, involvement in legal internships, and service as a teaching assistant for two terms, for which he received tuition credits in lieu of a salary.

The Committee and the Board discussed with the applicant the analogy between his duty as manager of the restaurant to collect and remit the taxes and the fiduciary duty of an attorney to protect and lawfully d'sburse funds from a client trust account. The Board concluded that at the present time he lacked the appreciation of the similarity of the obligations and responsibilities. He indicated that at the time, he didn't "feel so much as a moral obligatior. to the State." Although he indicated that he does now, "It was easy to get away with it. Not that I felt that I was getting away with it. It was easy to postpone it. It wasn't a problem until it got crucial." Most significantly, he told the Committee,

Practically speaking, I feel that it is different because I really never did have the money in hand in a separate account particularly on paper, something like that where I drew from that to pay my grocery bills for the week. It was never there. It was just that the next day's income

would go to pay the previous day's bills or weeks or months, however.

The applicant's testimony before the Board and the Committee as to the amount of his student loans was inconsistent. Before the Committee, he stated that his law school loans totalled $40,000. Before the Board, however, he produced a statement indicating that the principal was $54,703 as of May 29, 1994. Before this Court, he explained that his testimony was inaccurate because he was in the process of consolidating his loans with Sallie Mae.

In sum, the Board concluded that the applicant failed to satisfy his burden of proof by clear and convincing evidence that he presently possesses the good character and fitness necessary for admission to the Maryland Bar. This conclusion was based on several factors: the applicant's lack of "accuracy, clarity, candor and truthfulness" in his testimony, his lack of financial responsibility as evidenced by his failure to fully accept his obligation for his debts, and his failure to appreciate the analogy between his duty to remit sales and withholding taxes and the fiduciary duty of an attorney to protect and lawfully disburse client funds. These findings are fully supported by the record.

The applicant appeared before this Court to show cause why his application should not be denied. He stated that he regrets the confusion and inconsistencies and attempted to explain the discrepancies in his testimony before the Character Committee and the Board. He stated that he was not prepared to present information regarding his financial condition at the Committee hearing because he believed the hearing was to be informal in nature. He maintains that his testimony before the Board was clear and accurate and that any discrepancies in his testimony were clarified by research he conducted after the Committee hearing. He advised this Court that he mistakenly stated to the Committee and the Board that the I.R.S. was successful in garnishing his wages, when in fact it was not. He indicated that he presently owes $57,184 in student loans, $13,754 to Pennsylvania, and $125,000 to the

I.R.S. He maintains that he wishes to fulfill his ultimate goal of meeting his financial obligations, and that, after consultation with professors and tax attorneys, he intends to pursue a course that would allow him to satisfy his obligation through installment payments and an offer of compromise.

### III.

This Court is charged with "the primary and ultimate responsibility for regulating the practice of law and the conduct and admission of attorneys in this State." *In Re Application of Allan S.*, 282 Md. 683, 689, 387 A.2d 271, 275 (1978). In regulating admission to the Bar, this Court has the responsibility "to make certain that those who practice law . . . are those most likely to adhere to the high standards of integrity which characterize the Maryland Bar." *See In re Barton*, 291 Md. 61, 63–64, 432 A.2d 1335, 1336 (1981) (stating the responsibility of the Court in assessing application for readmission to the Bar). This Court's role is "to protect the public and safeguard the justice system by assuring that those admitted to the bar are of such character and fitness as to be worthy of the trust and confidence such admission implies." *See In re Majorek*, 244 Neb. 595, 508 N.W.2d 275, 281 (1993). Good moral character is universally required for admission to the Bar. *Application of Allan S.*, 282 Md. at 689, 387 A.2d at 275. On the importance of good moral character, Justice Frankfurter wrote:

> One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to "life, liberty, and property" are in the professional keeping of lawyers. . . . From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

*Schware v. Board of Bar Examiners*, 353 U.S. 232, 247, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring).

Absolute candor is a requisite for admission to the Bar of this State. Writing for the Court in the often-quoted case of *In Re Application of Allan S.*, Chief Judge Murphy noted:

> While there is no litmus test by which to determine whether an applicant for admission to the Bar possesses good moral character, we have said that no moral character qualification for Bar membership is more important than truthfulness and candor. Where, as here, an applicant for admission to the Bar is shown to have committed a crime, the nature of the offense must be taken into consideration in determining whether his present moral character is good. Although a prior conviction is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation. Thus, a prior conviction must be taken into account in the overall measurement of character and considered in connection with other evidence of subsequent rehabilitation and present moral character.

282 Md. at 689–90, 387 A.2d at 275 (citations omitted). In original admissions to the Maryland Bar, the test of present moral character is whether, "viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion." *In re Application of A.T.*, 286 Md. 507, 514, 408 A.2d 1023, 1027 (1979); *Application of Allan S.*, 282 Md. at 690, 387 A.2d at 275.

▪ The conduct of an applicant in satisfying his or her financial obligations and exhibiting financial responsibility is an important factor in assessing good moral character. *In re Application of Charles M.*, 313 Md. 168, 178–80, 545 A.2d 7, 12 (1988); *see also Florida Bd. of Bar Examiners*, 645 So.2d 972,

974 (Fla.1994); *In re Gahan,* 279 N.W.2d 826, 829–30 (Minn. 1979); *In re Steele,* 262 Mont. 481, 494, 865 P.2d 285, 294 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2136, 128 L.Ed.2d 866 (1994); *In re Parry,* 72 Ohio St.3d 75, 647 N.E.2d 774, 775 (1995); *Cf. In re J.C.B.,* 655 So.2d 79 (Fla.1995). We agree with the Minnesota Supreme Court's holding that the "failure of a person to honor his legal commitments adversely reflects on his ability to practice law, evincing a disregard for the rights of others." *Gahan,* 279 N.W.2d at 829; *see also In re Anonymous,* 74 N.Y.2d 938, 550 N.Y.S.2d 270, 549 N.E.2d 472 (1989); *In re Petersen,* 250 Mont. 325, 820 P.2d 1288 (1991).

■ The Board's conclusion that an applicant does not possess the requisite moral character is entitled to great weight. *Application of A.T.,* 286 Md. at 515, 408 A.2d at 1028; *Application of Allan S.,* 282 Md. at 690–91, 387 A.2d at 276. To properly exercise its responsibility, however, this Court must independently evaluate the applicant's present moral character based upon the records made by the Committee and the Board. Rule 5(d)(3); *Application of Charles M.,* 313 Md. at 178, 545 A.2d at 12; *In re Application of K.B.,* 291 Md. 170, 177, 434 A.2d 541, 544 (1981).

■ Our consideration of the entire record leads us to conclude that the applicant has failed to satisfy his burden that he presently possesses those qualities that comprise good moral character necessary for the practice of law. We shall consider those character traits that relate to the applicant's present fitness to practice law and to the State's legitimate interest in protecting prospective clients and the system of justice. We believe the record shows that the applicant does not appreciate the fiduciary responsibility incumbent upon an attorney when entrusted with the monies of another person. He does not appreciate the analogy between the tax obligations and the client trust account responsibilities. In addition to his lack of candor and contradictory testimony on critical issues, the applicant has displayed an inability to recognize his dereliction of a moral duty.

We believe that the applicant's failure to honor his financial obligations evidences a disregard of a legal obligation and reflects adversely on his fitness to practice law. *See Attorney Griev. Comm'n v. Barnes,* 286 Md. 474, 408 A.2d 719 (1979) (ordering disbarment of attorney for willful failure to file federal income tax return with intent to avoid payment of taxes); *see also Gahan,* 279 N.W.2d at 831 (finding that "financial irresponsibility [in failing to repay student loans] reflects adversely on an applicant's ability to manage financial matters and reflects adversely on his commitment to the rights of others, thereby reflecting adversely on his fitness for the practice of law"). The applicant's failure to pay the Pennsylvania sales taxes and the federal employee withholding taxes occurred over an extended period of time. The failure to file the returns and pay the taxes constituted the willful avoidance of a known legal obligation.

Significantly, this legal duty has a fiduciary component. Money that is withheld from employees is held in trust for the government. 26 U.S.C. § 7501(a); 26 C.F.R. § 31.3402(a)–1(f); Maryland Code (1988, 1994 Cum.Supp.) § 10–906(b) of the Tax–General Article; 72 Pa.Cons.Stat.Ann. § 7225 (1990). "[T]hose moneys are not to be spent; they belong to the State." *Attorney Griev. Comm'n v. Boyd,* 333 Md. 298, 307, 635 A.2d 382, 386 (1994). In *Boyd,* we found the use of withheld funds to meet business expenses to be indicative of dishonesty. *Cf. id.* at 307, 321–22, 635 A.2d at 386–87, 393–94.

In addition, the record suggests that the applicant has been avoiding his debt to the I.R.S. and Pennsylvania. Between his release from prison and enrollment in law school, the applicant worked in the restaurant industry. There is no evidence, however, that he attempted to pay any money to the I.R.S. during this period, though income tax refunds apparently were offset against the tax delinquency. Furthermore, he chose to reimburse his father in preference to the I.R.S. While the applicant's testimony and the documents from the I.R.S. present a conflicting picture of the impact and the timing of garnishment of his wages at the White Dog Cafe, it does appear that the prospect of garnishment was "a great incen-

tive" to attend law school. Once enrolled, he did contact the I.R.S., but by then he had decided not to work "because the income I would have received would have gone directly to the I.R.S."

Given the duties that attorneys are ordinarily required to perform, we think that the applicant's failure to carry out his significant legal obligation to satisfy his tax debt to the federal government and the Commonwealth of Pennsylvania is connected to his fitness to practice law. This conduct reflects adversely on the applicant's personal commitment to the proper administration of justice, as well as his honesty and truthfulness. *See Attorney Griev. Comm'n v. Baldwin,* 308 Md. 397, 407–09, 519 A.2d 1291, 1297 (1987) (suspending attorney for conduct prejudicial to the administration of justice where he failed consistently to pay State payroll withholding taxes in a timely manner over a seven year period); *Board of Law Examiners v. Stevens,* 868 S.W.2d 773, 781 (Tex.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2676, 129 L.Ed.2d 811 (1994).

The record amply demonstrates the applicant's neglect of his financial responsibilities. His present debts exceed $193,-000. Despite his sizeable I.R.S. debt upon entering law school, the applicant financed his education mainly through student loans and declined to seek any employment for pay while in school.[4] Upon graduating from law school and becoming a member of the California Bar, he focused less on developing a law practice and more on becoming a member of the Maryland Bar. His conduct does not support his claimed rehabilitation in terms of "becom[ing] more aware of my obligations and my responsibilities."

---

4. We in no way intend to cast aspersion on those who finance their education through student loans or those who perform public interest legal work for low pay despite their outstanding loans. We recognize that because of the high cost of education, many people will finance their schooling through loans. It is not the applicant's academic debt, but rather the combination of his unsatisfied debt to the I.R.S., his failure to work for pay while in school, the ever-growing amount of his debt, and his intent to compromise his federal obligation that is at the heart of our determination that the applicant lacks financial responsibility.

■ Finally, we are particularly troubled by the inconsistencies, contradictions, and the evasive nature of the applicant's testimony before the Committee and the Board. Lack of candor and misleading or evasive answers to the Committee and the Board's questions may be proper grounds for a finding of lack of good moral character. Rule 5(a); *see also In re Green*, 464 A.2d 881 (Del.1983). At the time of the hearings, the applicant was forty-three years old and a law school graduate. It should have been clear to him that in order to carry his burden of proof in this proceeding, he would have to be accurate, clear, candid, and truthful. We agree with the Board that "he does not understand the high standard of integrity expected of an attorney."

The applicant's claim that he is rehabilitated is not persuasive. He maintains that he has been rehabilitated, relying on his success at the White Dog Cafe and in law school and the letters of reference in support of his application. His success at the White Dog Cafe must be balanced against his failure to apply his earnings to the I.R.S. debt. Likewise, his commendable performance of volunteer legal services also impacted adversely on his ability to satisfy his financial obligations. His references make no mention of his criminal conviction, and, in response to the Board's standard question on the reference form, two of the three letters written in his behalf indicated they had no knowledge that the applicant had been involved in any incident that might reflect unfavorably on his character.

We conclude that the applicant has not "so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion." *Application of Allan S.*, 282 Md. at 690, 387 A.2d at 275. The applicant has failed to demonstrate his present good moral character and fitness to justify his admission to the Bar of Maryland. We shall not order his admission.

*IT IS SO ORDERED.*