# IN RE APPLICATION OF K. B. FOR ADMISSION TO THE BAR OF MARYLAND

[Misc. No. 2, September Term, 1981.]

*Decided September 8, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Edward Smith, Jr.,* for applicant.

RODOWSKY, J., delivered the opinion of the Court. ELDRIDGE, J., concurs in the result only.

K.B. asks this Court to find that he is of good moral character [1] and to pass an order directing that he be admitted to the Bar of this Court. The applicant plead guilty in the United States District Court for the District of Maryland on June 11, 1976 to mail fraud involving the use of fictitious names in violation of 18 U.S.C. § 1342 (1976). The State Board of Law Examiners (the Board) recommends K.B.'s admission. For the reasons hereinafter set forth, we are unwilling to accept that recommendation.

The applicant was born in Baltimore City on February 1, 1946. He was raised by his grandparents who maintained moral values in circumstances of poverty. Upon graduation from public high school at age 18, K.B. worked for at least two years in the payroll department of a large manufacturing company in Baltimore. In September 1966 K.B. commenced college level studies which he completed in June of 1971 at age 25. He was elected president of the student government. During college, on October 16, 1967, he married L.S. Three weeks later he entered into a bigamous marriage with D.P., who was pregnant by him. There was never any criminal charge of bigamy.

K.B. disclosed these two relationships in his Application for Registration as a Candidate for Admission to the Bar of Maryland. He attributes the entanglement to foolishness in his youth and was unable to unravel it immediately because of a lack of funds. A son was born of the marriage with L.S. She obtained a divorce *a vinculo* in May of 1972 and was awarded custody of the son. K.B. has made the required payments for the support of his son and seems to have maintained a close relationship with the boy through the exercise of visitation rights. A daughter was born of the union with D.P. D.P. obtained a decree of annulment in February 1972 under which she was awarded custody of the daughter and under which K.B was ordered to pay $20.60 bi-weekly for support of the child and an additional $5.00 bi-weekly to liquidate an outstanding arrearage of child sup-

---

1. The finding is required by Rule 13 of the Rules Governing Admission to the Bar of Maryland and by Md. Code (1957, 1981 Repl. Vol.), Art. 10, § 3(c).

port in the amount of $1,247.50. Because of K.B.'s conviction, the Character Committee for the Eighth Judicial Circuit had no occasion to pursue whether this support obligation has been honored, or to determine whether legal responsibility for the support of K.B.'s daughter has been assumed by someone else.

In his Application for Admission which was filed August 1, 1974, K.B. said of these relationships:

> This situation has caused me a great deal of embarrassment and it has also placed a not insubstantial obstacle in the path of my career. I feel that I have learned and profited by this mistake. Believing that frankness is infinitely preferable to subterfuge, I've determined to take a candid approach to explain to the bar examiners the full story surrounding these marriages and the subsequent events which have led to my extrication from them.

Two weeks after this statement was made to the Board, K.B was engaged in the scheme of mail fraud for which he was later convicted.[2]

K.B. was admitted to law school in September of 1971. He repeated the first year and graduated in May of 1975, at age 29. His fellow students elected him president of the student bar association and the faculty selected him for an award at graduation which is based on outstanding qualities of leadership and character. He was also very active in his church, where he taught Sunday school and worked with the choir. K.B. received financial aid to enable him to pursue his legal studies. In the summers of 1972, 1973 and 1974 he worked as a law student intern in the Office of the State's Attorney for Baltimore City. During the 1974 employment his salary was $150 per week.

On August 14, 1974, K.B., using a fictitious name, applied

---

2. Although K.B.'s guilty plea admitted the indictment allegation that the fraud scheme began earlier, about June 1, 1973, the record available to us does not reflect the factual basis of that allegation.

for, and was issued, an Amoco credit card.[3] On January 16, 1975, K.B. applied for another account with Amoco in a different fictitious name and was issued a credit card in that name. On July 10, 1975, K.B. made application in a third fictitious name for yet another account with Amoco, for which a credit card was issued.

K.B. sat for the bar examination conducted July 29-30, 1975, but failed. As part of the investigation preceding anticipated admission to the Bar, letters were sent to the Character Committee for the Eighth Judicial Circuit in October 1975 by members of the Bar and former teachers of K.B., in which they expressed their opinion that he was of good character. K.B. started to work as a settlement officer for the Baltimore agency of an interstate title insurer on September 15, 1975.

On that date, using a fictitious name, he applied for, and was issued, a credit card with The Hecht Company which is the Baltimore-Washington Division of May Department Stores Company. This application contained a false social security number and false employment information. As of October 3, 1975 there were two automobiles registered in Maryland to K.B., one of which was a 1975 Chevrolet Camaro.

Meanwhile, postal inspectors working with the security department of Amoco had K.B. under investigation. On November 17, 1975 a search warrant was executed at K.B.'s home, evidence of mailings was seized and K.B. was arrested. He was released on bail. His title company employer transferred K.B. from work as a settlement officer to title abstracting but continued his salary at the settlement officer level notwithstanding the fact that it was higher than that usually paid to novice abstractors.[4]

---

3. In each application for open end credit involved in the fraud scheme, K.B. used a given name wholly different from his own and either his true surname or a variation on it utilizing an additional consonant. He used his correct address. K.B. also had an Amoco credit card which was issued in his genuine name.

4. K.B. told the Board that he was "promoted" from settlement officer to title "examiner."

K.B. sat for the winter 1976 bar examination, but failed. The record does not reflect any notification at that time by K.B. to the Board of his arrest. However, there is no express requirement that an applicant advise the Board at any particular time of a change in information bearing on character, so long as the Board is advised in writing before the applicant's appearance to take the oath of an attorney.

By privately engaged counsel, K.B. negotiated a plea to one count of the indictment against him. That count was based upon a specific mailing, but it incorporated the allegations detailing the scheme to defraud. By his guilty plea entered at a rearraignment on June 11, 1976, K.B. admitted that "at the time he made the [credit account] applications and at the time [he] did utilize the above-described credit cards to purchase merchandise and services on credit, [he] had no intention of making payment for the merchandise and services so purchased." That guilty plea further admitted the following allegation:

> It was a further part of said scheme and artifice to defraud that the defendant would permit his friends and associates to utilize said fraudulently obtained credit cards to purchase merchandise and services on credit in exchange for payment by these individuals to the defendant. The defendant would and did fail to furnish the monies so received by the defendant from his friends and associates to the victim companies.[5]

On the two days preceding K.B.'s sentencing hearing of July 29, 1976, he sat for the summer bar examination, which he failed. At the sentencing hearing K.B.'s minister, members of the Bar and law school teachers testified, or were prepared to give cumulative testimony, that K.B. was a per-

---

5. In K.B.'s answer filed in this Court to the order to show cause why the recommendation of the Board should not be rejected, K.B. referred this Court to the transcript of the sentencing hearing in federal court and quoted portions from that transcript. Review of that transcript reflects a representation by the government to the federal court that the prosecution's case included evidence of sale by K.B. of use of the Amoco credit card at a discount from the face amount of the charges incurred on it by the user.

son of good character. Pleading in mitigation of sentence, one of K.B.'s three attorneys argued that "[t]here is nobody here at the [defense] table that entertains the slightest belief that Mr. [B] will ever be a lawyer." [6] United States District Judge Herbert F. Murray imposed a sentence of one year, commencing August 30, 1976.

K.B. served 89 days in the federal detention center at Allenwood, Pennsylvania and was released to a halfway house in Baltimore. The date of expiration of all restraints based on the federal sentence does not appear in the record.

On February 24, 1977, K.B. was employed by the Department of Human Resources. After several months there, a two member firm of attorneys in Baltimore engaged K.B. as a law clerk. His duties included handling funds of, or entrusted to, the firm. K.B. resumed his activities with his church, its choir and its Sunday school, as well as in the community. He took the bar examination held in February 1977 and passed. On May 20, 1977 he filed a supplemental affidavit with the Board advising of his federal conviction.

K.B.'s passing of the written examination inspired a new round of letters of endorsement, including letters from several judges. The authors, while cognizant of K.B.'s conviction, expressed in May and June of 1977 their view that K.B. had learned his lesson. On June 14, 1977 the Character Committee reported to the Board "that the nature of this offense and its recent occurrence [are] sufficient justification for not admitting Mr. [B] to the practice of law *at this time*." (Emphasis in original.) A hearing was held before the Board on November 23, 1977, but action on K.B.'s application was deferred in order to allow K.B. to effect restitution to Amoco.[7] Counsel for K.B. had on November 7, 1977 obtained from Amoco an offer to settle civil liability to Amoco for $2,500. At the hearing before us it was counsel's

---

**6.** Counsel was arguing almost two years before In re Application of Allan S., 282 Md. 683, 387 A.2d 271 (1978) was decided by a 4-3 vote.

**7.** The record does not reflect whether any charges were made on the fictitious name account at The Hecht Company and, if so, whether they were ever paid in whole or in part.

recollection that this settlement represented a little better than $.50 on the dollar. The affidavit of a postal inspector made November 17, 1975 in applying for the search warrant states the total of the charges on the fraudulent Amoco credit cards to be at least $3,310, without any payments having been made to that date for the purchases thereon. The settlement called for monthly payments of $150. The settlement amount was paid in full by April of 1979.

K.B. continued to work for the two member law firm until about November of 1979. That firm has told the Board that they would offer K.B. a partnership if he were admitted to the Bar. Since November of 1979 K.B. has worked as a law clerk in the firm of his counsel in these preceedings, who has been K.B.'s friend since their college days. With this firm K.B. is also entrusted with handling the funds of the firm and of its clients. These attorneys stand ready to have K.B. practice law with them if he should be admitted.

A further hearing was held by the Board on October 29, 1980. By this time K.B. had become even more deeply involved in the activities of his church. He had been elected a trustee. One of his responsibilities is to deposit the offerings collected at services which have totaled as much as $3,000 in a single week. The 1980 hearing elicited a new round of letters to the Board from the endorsing attorneys and trial judges who reaffirmed their confidence that K.B. had been rehabilitated.

In its initial report of December 11, 1980 to this Court, the Board recommended the admission of K.B. It was "convinced that the applicant has been 'completely rehabilitated.'" Its reasons are summarized in the penultimate paragraph of the eight-page report:

> The Applicant ... began his quest for admission to the bar of Maryland in 1975. He was detoured in 1976 by his criminal conviction, and thereafter by failures at passing the bar examination. This obstacle was removed in 1977. Has the blot on his character been obliterated during this time? We

think so. We believe the Applicant is quite sincere in his repentance; he has done penance by making restitution to the oil company for improper use of the credit cards. He has been more than a model citizen since his sole slip from grace. He has given of his time and talents for his religious faith which quite obviously means a great deal to him. He is faithful in his obligation as a father both financially and emotionally as attested by an affidavit executed by his former wife (in whose custody is his son, . . .) as late as October 27, 1980, in which she extols [K.B.] as projecting an image of one "with strong Christian virtues," "an honest and trustworthy person."

We do not agree with the Board's recommendation. While that recommendation is entitled to great weight, this Court must make its own independent evaluation of the applicant's present moral character based upon the records made by the Character Committee and the Board. *In re Application of Allan S.*, 282 Md. 683, 690-91, 387 A.2d 271, 276 (1978). The ultimate responsibility for maintaining the standard of integrity required of one who would come to the Bar in Maryland rests with this Court.

"Where, as here, an applicant for admission to the Bar is shown to have committed a crime, the nature of the offense must be taken into consideration in determining whether his present moral character is good" and "[a]lthough a prior conviction is not conclusive of a lack of present good moral character, particularly where the offense occurred a number of years previous to the applicant's request for admission, it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation." *Id.* at 690, 387 A.2d at 275. In the present matter, we do not deal with a single transgression. Four separate fraudulent applications for credit accounts are involved. In the period between August 1974 and K.B.'s arrest in November of 1975, $3,310 of purchases were charged to the fictitious name Amoco accounts. At the price of gasoline prevailing at

that time, it is conservative to estimate that in excess of 200 transactions had to have been involved. Each of these transactions constituted an offense proscribed by Md. Code (1957, 1971 Repl. Vol., 1974 and 1975 Cum. Supps.), Art. 27, § 142A (d). The federal crime of mail fraud, of which K.B. was convicted, is a crime involving moral turpitude. *Attorney Grievance Commission v. Klauber,* 289 Md. 446, 423 A.2d 578 (1981). We have said that "[t]here can be no doubt . . . that thievery of a repetitive nature, as here, is usually indicative of a serious character flaw" and that "in such cases, the evidence of rehabilitation must be entirely convincing . . . ." *In re Application of David H.,* 283 Md. 632, 640-41, 392 A.2d 83, 88 (1978).

In support of its finding of rehabilitation, the Board quoted from the applicant's testimony before it. In part K.B. said:

> As soon as the Postal Inspectors came to my house, and I was coming back from a prayer meeting, and I was walking up to my house when I saw that the door was off the hinges. I was rehabilitated then because I was scared to death.
>
> You couldn't pay me to spit on the sidewalk now. They really scared me to death. I was rehabilitated then.
>
> . . . When they first came in, and they put those handcuffs on me, I was rehabilitated then and there.

It would be a most unusual case indeed where rehabilitation, sufficient to permit admission to the Bar of a convicted adult thief, can be shown to have taken place simultaneously with getting caught, and this is not such a case. As in *In re Application of David H., supra,* "the applicant's determination to conclude his criminal activity apparently did not flow from an 'inborn' resolve to change his moral character . . . ." 283 Md. at 640, 392 A.2d at 87. After fifteen months of credit card fraud, the criminal activity terminated when K.B. was arrested.

The Board also relied on K.B. having made restitution. After K.B.'s arrest in November of 1975 he continued to work for the title company until his sentencing in July of 1976. There is no indication that the applicant undertook to make any restitution during that period. The applicant testified he made a payment of several hundred dollars to Amoco prior to leaving for prison. Following his confinement, the applicant had been employed continuously since February of 1977, but he did not resume making any restitution until November 1977. The plan of partial restitution, which was acceptable to Amoco, was arranged by K.B.'s attorney in obvious preparation for the November 1977 hearing before the Board. We are far from convinced that the plan of partial restitution was prompted by a full and complete rehabilitation which occurred two years earlier at the time of arrest. In the interval K.B. had passed the February 1977 written bar examination. This certainly created an incentive to attempt to neutralize the impediment to admission of the fraud conviction.

We are also troubled by an apparent lack of candor on the part of the applicant in his appearance before the Board of November 1977. When asked what he had possibly hoped to gain out of the scheme, K.B. testified:

> Just some gasoline. I didn't intend to gain anything. I figured that if I was going into a filling station they would be writing down the tag number — I hadn't intended to beat anybody criminally because if I would have, I would have come up with something better than that because all they have to do is call the Department of Motor Vehicles.
>
> I just thought it would be a simple thing that I could postpone the paying of the entire debt if I got maybe $100 worth of gas a month, and if I sent them $10 or $8.00 or whatever I could, that they would postpone any judgment seeking or anything of that nature until after I was graduated from school and at such time that I had a job and could pay them off. It didn't go that way.

This testimony reflects an intention not to pay in accordance with the terms of the credit accounts. But more fundamentally, it is inconsistent with the record. The guilty plea admitted there was no intention to pay. At the hearing before this Court, it was admitted that a new Amoco account was opened by fraud when the delinquency on the next prior account had reached the point at which the prior account would no longer be honored. Further, even after K.B. had graduated from law school and had obtained full-time employment in September of 1975, he continued to make purchases using the fraudulently obtained credit cards. A purchase was made at an Amoco station as late as November 6, 1975. Possibly even more significant is that K.B. expanded the intended victims of the fraud by opening the fictitious name account with The Hecht Company four months after he had graduated from law school and at about the time he started full-time employment.

In weighing the evidence of rehabilitation based on opinion and on church and community activities, it must be recognized that we deal here with a continuous course of criminal activity which was perpetrated by a mature adult. K.B. was 28 and 29 years of age when the fraud scheme was in effect. At age 21 he had become embroiled in the bigamous marriage, but he told the Character Committee in his application filed when he was 28 years old, that he had learned his lesson as a result of that earlier experience. Obviously he did not. We must further recognize that the continuous course of criminal activity occurred while K.B. was in his senior year of law school and after his completion of law school studies. He had the benefit of four years of exposure to the ethics and traditions of the profession. Yet, as a graduate lawyer and successful candidate at the February 1977 bar examination, K.B. told the Board in November of 1977 the following:

> Other people used the cards, but they weren't involved. They didn't know anything about committing any crime. As I didn't know either.

> I became aware that it was a crime after the Postal Inspector called me and told me he wanted to talk to me. I knew that it was criminal then.

When one recalls that K.B. also served three summers during law school as an intern in the Baltimore City State's Attorney's Office, this statement is not credible. "[N]o moral character qualification for Bar membership is more important than truthfulness and candor." *In re Application of Allan S., supra,* 282 Md. at 689, 387 A.2d at 277.

We glean from the record as a whole the very distinct impression that this applicant's past criminal problem resulted from the perceived necessity to maintain a desired level of social prestige which, in this case, involved operating a car, and from a willingness to risk violating serious criminal laws in order to do so. Every experienced practitioner knows of cases where an attorney has yielded to the temptation to "borrow" clients' funds entrusted to him because of the pressure to maintain a certain social status while waiting for some fees to come in. It is because of the great risk to the public in admitting to the Bar one who has exhibited this serious character flaw that we require the evidence of present moral fitness to "unequivocally demonstrate . . . full and complete rehabilitation." *In re Application of David H., supra,* 283 Md. at 641, 392 A.2d at 88.

Under all the circumstances presented here, the applicant fails to meet that heavy burden.

*IT IS SO ORDERED.*

Eldridge, J., concurs in the result only.