943 A.2d 1247

**In the Matter of the Application of Kevin Charles STERN
for Admission to the Bar of Maryland.**

**No. 10 Sept. Term, 2007.**

Court of Appeals of Maryland.

March 12, 2008.

Reconsideration Denied May 6, 2008.

Phillip G. Dantes (Wallace and Dantes, L.L.C.) Towson, MD, for Applicant.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JJ., and ALAN M. WILNER and DALE R. CATHELL, JJ. (Retired, specially assigned).

BATTAGLIA, Judge.

In this case we are asked to decide whether to grant the petition for admission to the Maryland Bar of Kevin Charles Stern, who has shown a pattern of financial irresponsibility, misrepresented his financial situation on his law school and Bar applications and exercised poor judgment with regard to a relationship with an underage female. Both the Character Committee and the State Board of Law Examiners recommended that Mr. Stern not be admitted, and we agree that Mr. Stern presently does not possess the requisite moral character and fitness for the practice of law required to be admitted to the Maryland Bar.[1]

## I. Background

On May 19, 2005, Kevin Charles Stern filed an application with the State Board of Law Examiners ("Board") for admission to the Maryland Bar pursuant to Rule 2.[2] In accordance with Rule 5(b)(1),[3] Mr. Stern's Bar application was forwarded to a member of the Character Committee for the Sixth Appellate Circuit. In the course of the Committee's investiga-

---

1. Rule 5(a) of the Rules Governing Admission to the Bar of Maryland states in pertinent part:
   (a) **Burden of proof.** The applicant bears the burden of proving ... the applicant's good moral character and fitness for the practice of law.

2. Rule 2(a) provides in pertinent part:
   (a) **By application.** A person who meets the requirements of Rules 3 and 4 may apply for admission to the Bar of this State by filing an application for admission, accompanied by the prescribed fee, with the Board.

3. Rule 5(b)(1) states in relevant part:
   **Investigation and report of character committee.** (1) On receipt of a character questionnaire forwarded by the Board pursuant to Rule 2(d), the Character Committee shall (A) through one of its members, personally interview the applicant, (B) verify the facts stated in the questionnaire, contact the applicant's references, and make any further investigation it finds necessary or desirable, (C) evaluate the applicant's character and fitness for the practice of law, and (C) transmit to the Board a report of its investigation and a recommendation as to the approval or denial of the application for admission.

tion, additional documents were obtained from Mr. Stern, who also was later interviewed. As a result of matters revealed during its investigation, the Committee conducted a hearing under Rule 5(b)(2)[4] on September 18 and 19, 2006, during which Mr. Stern, represented by counsel, testified and presented the testimony of two additional witnesses; at least twenty-eight exhibits also were submitted by him, mainly addressing his then current financial status, credit history and disclosures made on his law school and Bar applications. The Committee called three witnesses.

The Committee found that in 1993, Mr. Stern opened a credit account with Discover Card in order to meet his regular living expenses while attending Frostburg State University and to obtain cash advances to finance the startup of his business, Priority Plus, which provided various services to law firms including service o f private process.[5] As of May of 2001, the unpaid balance on the Discover Card account, the Committee found, was $11,190.00.[6] Eventually, the Discovery Card balance was sold to NCO Financial Systems, Inc., a debt collector.[7] The Committee found that in 2006, after Mr. Stern had submitted his Bar application,[8] he had negotiated a settle-

---

4.  Rule 5(b)(2) provides in pertinent part:

    If the Committee concludes that there may be ground for recommending denial of the application, it shall notify the applicant and schedule a hearing. The hearing shall be conducted on the record and the applicant shall have the right to testify, to present witnesses, and to be represented by counsel.

5.  Mr. Stern operated Priority Plus after he graduated from college in 1997 until he sold the business to his father in 1999 or 2000 for $10,000.00.

6.  The record reflects that the unpaid balance on the Discover Card account was $11,190.71. This minor difference, in terms of our decision, is irrelevant.

7.  NCO Financial Systems, Inc. filed suit against Mr. Stern in February of 2004.

8.  The Board determined that Mr. Stern began to satisfy the debts identified by the Committee as paid not only after he had submitted his

ment with NCO. Just 33 days before the Committee hearing, on August 15, 2006, Mr. Stern's mother submitted a check to NCO for $6,000.00 in settlement of the debt.

In 1996, Mr. Stern applied for and received a credit card from Home Depot. The record does not reflect the amount of the unpaid account balance, but subsequently, the delinquent account was sold to Monogram Credit Card Bank of Georgia, which filed suit against Mr. Stern. In July of 2001, Mr. Stern tendered $705.00 to Monogram in settlement.

In 1997, Mr. Stern obtained a credit account from First USA Bank to pay for living expenses and also to finance Priority Plus. The delinquent balance rose to $8,375.73, and subsequently, was sold to Asset Acceptance LLC, which filed suit against Mr. Stern in February of 2003. In March, a judgment was entered against Mr. Stern in the amount of the unpaid balance and two separate writs of garnishment were issued in July of 2004 and April of 2005. Thereafter, following Mr. Stern's submission of his Bar application, he agreed to a settlement.

In 1999, Mr. Stern took out a loan to purchase a car. The past due loan amount grew to $4,476.91, and subsequently, the unpaid balance was purchased by American General Finance. The account was then sold to Debt One, and then, again, to American Coradius International, which, in 2000, obtained a judgment against Mr. Stern. Again, after he had submitted his Bar application, Mr. Stern settled the dispute by remitting $2,638.00 in satisfaction in October of 2005.

Mr. Stern also obtained a credit card from Citibank Visa in 1999. The account's unpaid balance rose to $3,833.07, and thereafter, the Committee found, the account was sold to Unifund, which obtained a judgment in October of 2002.[9] Mr.

---

Bar application but also after he took a professional responsibility course in law school in 2004.

**9.** The record indicates, however, that the judgment against Mr. Stern on the Citibank Visa account was entered in June of 2003. This difference, in terms of our decision, is meaningless.

Stern satisfied the judgment in November of 2005, again, after he had submitted the Bar application.

In 2002, Mr. Stern opened another credit account, this time with Universal Card; its balance subsequently became $9,985.00. The account was sold to Asset Acceptance, which obtained a judgment in March of 2005. Mr. Stern settled for an unspecified amount and payment was made in September of 2005, once again, after he had completed his Bar application.

The Committee also found that Mr. Stern had had several other unpaid debts. One of them, involving Med 1 Yardmore Emergency Physicians, originated in 2003; the amount due, in May of 2004, was $313.00. Collection on the account was subsequently assigned to NCO, and in February 2005, Mr. Stern paid $251.00 in settlement. Another unpaid debt was with Cingular Wireless, to which Mr. Stern owed $480.00, in 2000. The record reflects that Cingular accepted Mr. Stern's payment in October of 2005, after he had submitted his Bar application.

The Committee further found that, in 2007, Mr. Stern had a student loan payment of approximately $260.00 a month, that was in good standing; his only other outstanding debts were a Capital One credit card that had a balance of $479.00 and a PayPal account with a $50.00 balance. According to a Personal Financial Statement prepared with the help of a financial advisor, Mr. Stern also had savings of $21,500.00, two cars valued at $16,000.00, a bicycle worth $5,000.00, personal effects valued at $15,000.00, and $10,000.00 worth of artwork.

The Committee also determined that Mr. Stern had omitted various credit accounts and other problems either in his law school application or Bar application. In his law school application, dated January 15, 2002, in response to the question, "Do you have any charges or judgments pending against you?", Mr. Stern did not reveal the judgment entered against him, in 2000, for $4,476.91, the amount past due on the car loan purchased by American General Finance. In his Bar application, dated May 1, 2005, in response to question 9(a),

"During the last five years I have established or maintained credit with the following," Mr. Stern disclosed that he had established credit with Discover Financial Services and First USA Bank, but did not reveal the other accounts with which he had established credit, including American General Finance, Citibank Visa and Universal Card; in response to the following question on the Bar application, "9 (b) I presently owe money, some part of which has been delinquent for more than 90 days, to the following," Mr. Stern referred to two accounts, Discover Financial Services and Med 1 Yardmore Emergency Physician, but did not reveal the other credit accounts that had been delinquent for more than 90 days, including those with American General Finance, First USA Bank, Universal Card, Citibank Visa, as well as his unpaid bill with Cingular Wireless; in response to the question on the Bar application, "The following is a complete list of all suits in equity, actions at law, suits in bankruptcy or other statutory proceedings, matters in probate, lunacy, guardianship, and every other judicial or other administrative proceeding of every nature and kind, except divorce or criminal proceedings, to which I am or have been a party," Mr. Stern indicated that he had been a party in a tort action in the district court and that there was a pending case in the same court in which Discover Financial Services sought collection of an unpaid debt, but did not reveal the other accounts, which similarly, had resulted in judgments being entered, including the American General Finance, First USA Bank, Citibank Visa and Universal Card accounts.

The Committee further found that Mr. Stern, when he was 26 or 27, had had an inappropriate relationship with a 15 year old female. The relationship, which became sexual after the female turned 16, lasted for approximately seven or eight years and ended in 2006; other allegations included in the young woman's testimony before the Committee were not relied upon.

In response, before the Committee, Mr. Stern proffered that he did not pay his outstanding debts because they became overwhelming, and he believed that making the required

minimum payments would be pointless. He also claimed that he had recognized the error of his ways and had sought the assistance of a certified financial advisor. The Committee, although acknowledging the steps Mr. Stern had taken, found these contentions to be shallow. According to the Committee, before Mr. Stern had sought assistance of a financial advisor to correct his debt problems, he knew that his debts had to be paid and had assets to do so, but did not satisfy his obligations. Instead, he continued to increase his debt until no one would extend him further credit. Moreover, the Committee found, that Mr. Stern had not provided any documentation as to his actual income during the period when the debts were incurred, and that he had not explained why he had enough money in his budget in 2003 for a trip to Jamaica. The Committee also concluded that Mr. Stern paid off the majority of his debts with graduation gifts and a loan from his mother.

Mr. Stern also told the Committee that he did not reveal the American General Finance judgment because he was unaware of its existence until he gathered his information to complete his Bar application. The Committee determined, however, that this argument was unavailing, because that there was an affidavit from a private process company averring that Mr. Stern had been served with the summons on May 30, 2000 at 102 W. Pennsylvania Avenue, Suite 105, in Towson, Maryland, so that to believe Mr. Stern would require a lack of faith in the process server's certification.

Mr. Stern also testified before the Committee that he did not try to hide any of his financial information on his Bar application, that he did his best to disclose everything, that any mistakes he made were unintentional, and that all of his information was eventually disclosed. The Committee concluded, however, that Mr. Stern had not fully disclosed all of the institutions with which he had maintained credit, all of his unpaid debts, nor all of the legal actions pertaining to his delinquent accounts.

Mr. Stern admitted that his relationship with the 15 year old female was unwise, but contended that he had maintained

his relationship with the female because she saw him as a "father figure," and because she had threatened on numerous occasions to report him to the Character Committee. The Committee found this explanation, however, entirely inconsistent with the fact that Ms. Stern and the young woman had had a sexual relationship.

The Character Committee issued a report dated March 28, 2007, in which the Committee found that Mr. Stern did not meet his burden of proof and then unanimously recommended that Mr. Stern be denied admission to the Maryland Bar based on the totality of the circumstances:

> The Character Committee voted unanimously to recommend that Kevin C. Stern not be admitted to the Maryland Bar. Looking at the totality of the issues and circumstances, the Applicant did not meet his burden of proving his present fitness and good moral character.

> First, the Committee believes that the Applicant has not shown a pattern of being fiscally responsible. For years, he allowed his debts to mount and made very few efforts to resolve the situation. He felt that paying nothing made sense back then and now feels his philosophy has been validated after discussing the matter with a financial advisor. Stern had a great revelation only recently that he should have at least communicated with his creditors in some fashion. Obviously, one form of communication would have been to pay something toward the bills. Based upon comments made to Mr. Rivas, Stern resented being labeled and harassed, presumably by creditors who were demanding payment.

> Even now it is not difficult to conclude that the only reason for addressing the credit issues was the Bar application process. Had there been no application, Stern would likely still have unsatisfied judgments and unpaid bills. He does not appear to have altered his lifestyle or pared down his expenses as a means of generating funds to pay his outstanding accounts. He lists $68,500 worth of assets that include artwork, some of which he could have or can now use to pay his bills.

The fervent cleanup of his credit is belated and unconvincing. He used graduation gifts and a loan from his mother to pay his creditors. He now has a new major creditor, one whom he is in no hurry to repay. Stern's pattern of addressing his financial obligations does not bode well for someone who will be handling client funds and managing what is essentially a cash business. Stern has not demonstrated that he can be fiscally responsible with his own money and therefore, is unlikely to be so with the money of his clients. He commented that his mother is currently managing his money. However, her name will not be on the law license.

Second, the Committee believes that the Applicant has shown very poor judgment in starting and continuing a romantic relationship with a young and obviously emotionally unstable person. If nothing else, the suicide attempt should have been a signal to back away from the 15 year old girl. Stern expects the Committee to understand, accept, and sympathize with his feeling of being trapped early on and later being sexually blackmailed. He claimed that every time he tried to break up with [her] she cried and became hysterical. He believed her threats about talking to the Character Committee and could not extricate himself from her clutches.

Third, the Committee believes the Applicant has not been entirely candid in his responses to its questions during the hearing and his answers provided on the Bar application. There were a number of implausible explanations, contradictions, and inconsistencies with the major ones concerning his financial affairs and his relationship with [the 15 year old girl]. First, for the reasons previously discussed, it is impossible to accept Stern's assertion that he had no knowledge of the civil judgments against him when he filed his law school application and did not learn of them until he prepared his Bar application. He admitted that creditors hounded him about his delinquent accounts. His experience with his Monogram account, which he finally paid off when it was in a seriously delinquent status, would have put him on notice that the ultimate step was a civil proceeding.

After settling that particular account, it is clear that Stern made a conscious decision to ignore his obligations. Second, there is the inconsistency in Stern's description of his relationship with [the fifteen year old girl]. His assertion of wanting to be a father figure to a fragile teenager does not mesh with his having deliberately lied to her about his age when they first met. He claims now that their more recent relationship has been based on sexual blackmail with their last intimacy occurring in May 2006, i.e., a few months before the hearing. He learned in June 2006 that [she] had made very serious allegations which led to a Character Committee hearing. His legal career has been on hold. It is difficult to believe that the considerable fallout from [the female's] accusations has not in and of itself destroyed the relationship between Stern and [her]. Instead, Stern says that they will remain friends and that he feels obligated to be there for her.

(alterations added).

The State Board of Law Examiners then convened a hearing on September 6, 2007, pursuant to Rule 5(c).[10] At that hearing, Mr. Stern was represented by counsel, testified, and presented the testimony of one other witness. Before the Board, Mr. Stern again asserted that he neglected paying his debts because he was overwhelmed and felt paying the minimum payments would not help subside his debt. Mr. Stern also testified that he had recognized the error of his ways and

---

10. Rule 5(c) states:

(c) **Hearing by board.** If the Board concludes after review of the Committee's report and the transcript that there may be grounds for recommending denial of the application, it shall promptly afford the applicant the opportunity for a hearing on the record made before the Committee. The Board shall mail a copy of its report and recommendation to the applicant and the Committee. If the Board decides to recommend denial of the application in its report to the Court, the Board shall first give the applicant an opportunity to withdraw the application. If the applicant withdraws the application, the Board shall retain the records. Otherwise, it shall transmit to the Court a report of its proceedings and a recommendation as to the approval or denial of the application together with all papers relating to the matter.

had made a concerted effort to correct his financial irresponsibility; he also claimed that he has repaid the loan from his mother by performing remodeling work on her home. He also told the Board that he did not reveal the American General Finance judgment on his law school application because he did not learn about it until he was gathering information to complete his Bar application. He iterated that, although he understood that the 15 year old female was not emotionally mature enough to maintain a relationship with him, he continued his relationship with her because she saw him as a "father figure." Mr. Stern also explained that he did not try to hide any of his financial information on his Bar application and that all of his information was disclosed before the Committee.

The Board adopted the Committee's findings and concurred with its recommendation that Mr. Stern's application for admission to the Maryland Bar be denied, because he had not met his burden of proving that he "possesses the present good moral character and fitness for admission to the Bar":

> The Committee's adverse recommendation is founded on three principle findings. First, the applicant demonstrated financial irresponsibility by his delay in addressing his debts until he recognized that his debts would be an obstacle in his quest to be admitted to the Maryland Bar. Second, the applicant demonstrated poor judgment in continuing a relationship with a young woman which he recognized was ill-advised from its inception. Third, the applicant demonstrated a lack of candor in connection with civil judgments which he failed to disclose on his law school application and in connection with his description of his relationship with the young woman.

> The applicant's testimony before the Board corroborated the findings of the Character Committee. The Board found unpersuasive the applicant's assertion that he neglected payment of his debts because the amount of debt was "overwhelming." In fact the debt, as he described it, was $10,000 at the time of his graduation from college in 1997. This debt was not student loans, but related to use of credit cards and revolving credit accounts for personal expenses.

The applicant operated businesses after his graduation from college, which netted him $10,000 when he sold them to his father and brother sometime in 1999 or 2000.

In 2002, the applicant entered law school, where he accumulated $58,000 in student loan debt and continued to make no effort to pay the delinquent retail credit debt. Only in 2004, after his law school professional responsibility course alerted him to the scrutiny he would face in the Bar admissions process, did the applicant begin to pay off his delinquent debt. In his testimony before the Committee, he testified that he ultimately completed the payments using money gifts he received upon graduation from law school and using money which his mother loaned him. Before the Board, he testified that he subsequently repaid the loans to his mother, in-kind, by performing remodeling work on her home. The Board is persuaded that, absent the exigency of the Bar admissions process, the applicant probably would have continued to ignore his obligation to repay his debt.

The applicant, when he was 25 or 26, initiated a friendship with a neighborhood girl who was 15 years old at the time. This relationship became an intimate one, according to the applicant, when the girl was 16. While the applicant's Bar application was pending, an attorney, who was an acquaintance of the girl's mother, addressed a letter to the Board, dated February 24, 2005, alleging that the applicant's intimacy with the girl began when she was 15 and that the relationship continued for many years, violently at times. The Committee's investigator interviewed the young woman in October 2005, and, at that time, the young woman affirmed and expanded upon the allegations in the attorney's letter.

The Committee subpoenaed the young woman and her mother to testify during its proceedings, and they hired an attorney to represent them and unsuccessfully sought to quash the subpoena. When she did testify on September 19, 2006, the young woman recanted much of the substance of the allegations she had made during her October 2005 interview with the Committee's investigator. The gist of her testimony was that she had lied about the applicant

because they had had a fight. There were substantial conflicts and inconsistencies between her statements during the interview and her testimony during the hearing. Afterwards, the Committee had lingering, unresolved concerns about the entire history and propriety of the relationship. The applicant's testimony made it clear that the young woman was not emotionally mature enough to enter into, much less maintain, her relationship with applicant. The relationship, which lasted for approximately seven or eight years, was marked by episodes of violent behavior and vandalism on her part (requiring police intervention on at least one occasion). The applicant testified that the young woman saw applicant as a "[father] figure", a role that applicant fulfilled while continuing his sexual relationship with her. Throughout his testimony to the Board, the applicant identified the young woman as the source of all of his difficulties with this aspect of his Bar admission process. He never once suggested that he bore any responsibility for entering into such an inappropriate relationship. After hearing the applicant's testimony, the Board reached the same conclusions about the applicant's poor judgment and lack of candor as did the Committee.

The Board is not persuaded that there is sufficient evidence that the applicant is rehabilitated at this time. The applicant's burden is to show that he possesses the present good moral character and fitness for admission to the Bar. In view of the applicant's questionable handling of and attitude toward his financial obligations and the poor judgment and lack of candor he exhibited regarding his turbulent personal relationship described above, the Board is not persuaded that the applicant has met this burden. The Board recommends, unanimously, that the applicant be denied admission to the Maryland Bar at this time.

(alterations added).

Pursuant to Rules 5(c) and 5(d),[11] a show cause hearing was held before this Court to determine whether it should accept

---

11. Rule 5(d) provides:

the Board's recommendation. Mr. Stern was represented by counsel.

## II. Standard of Review

The issue before us is whether Mr. Stern has met his burden of proving that he possesses the present good moral character to practice law. *In re Application of Brown,* 392 Md. 44, 54, 895 A.2d 1050, 1055 (2006); *In re Application of Hyland,* 339 Md. 521, 535, 663 A.2d 1309, 1316 (1995). Good moral character is denoted by "those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility." *Application of Brown,* 392 Md. at 54, 895 A.2d at 1055–56; *Application of Hyland,* 339 Md. at 534, 663 A.2d at 1315. Thus, the "ultimate test of present moral character, applicable to original admissions to the Bar, is whether, viewing the applicant's character in the period subsequent to his misconduct, he has so convincingly rehabilitated himself that it is proper that he become a member of a profession which must stand free from all suspicion." *In re Application of A.T.,* 286 Md. 507, 514, 408 A.2d 1023, 1027 (1979); *In re Application of David H.,* 283 Md. 632, 639, 392 A.2d 83, 87 (1978); *In re Application of Allan S.,* 282 Md. 683, 690, 387 A.2d 271, 275 (1978).

The Board's conclusions that an applicant does not possess the requisite moral character, and recommendation against admission to the Bar, are entitled to great weight. *Application of Hyland,* 339 Md. at 536, 663 A.2d at 1316; *In*

---

(d) **Review by court.**
(1) If the applicant elects not to withdraw the application, after the Board submits its report and adverse recommendation the Court shall require the applicant to show cause why the application should not be denied.
(2) If the Board recommends approval of the application contrary to an adverse recommendation by the Committee, within 30 days after the filing of the Board's report the Committee may file with the Court exceptions to the Board's recommendation. The Committee shall mail copies of its exceptions to the applicant and the Board.
(3) Proceedings in the Court under this section shall be on the records made before the Character Committee and the Board. If the Court denies the application, the Board shall retain the records.

*re Application of Charles M.*, 313 Md. 168, 178–80, 545 A.2d 7, 12 (1988); *In re Application of K.B.*, 291 Md. 170, 177, 434 A.2d 541, 544 (1981). To properly exercise its responsibility, however, it is incumbent on this Court to make its own independent evaluation of the applicant's present moral character based upon testimony and evidence submitted before the Character Committee and the Board. *See Application of Brown*, 392 Md. at 55, 895 A.2d at 1056; *Application of Hyland*, 339 Md. at 536, 663 A.2d at 1316; *Application of Charles M.*, 313 Md. at 178–80, 545 A.2d at 12; *Application of K.B.*, 291 Md. at 177, 434 A.2d at 544; *Application of Allan S.*, 282 Md. 683, 387 A.2d 271 (1978).

## III. Discussion

■ Mr. Stern admits that he has been financially irresponsible, but argues that he has been rehabilitated, such that he now possesses good moral character and is fit to practice law. He contends that his rehabilitation is evidenced by the fact that he has paid many of his creditors and has developed a financial plan with the assistance of a financial advisor. He argues that he is motivated by his desire to become a member of the Bar in order to pursue a profession and gain financial stability. Mr. Stern also points out, that unlike many of our prior cases in which we have not admitted candidates to the Bar, his conduct was not criminal. With respect to his failure to disclose the American General Finance judgment on his law school application, Mr. Stern suggests that he was unaware, at that time, of the judgment; he also asserts that he did not intend to omit any financial information on his Bar application and that he fully disclosed the extent of his debt to the Committee. Finally, with respect to his relationship with an underage female, Mr. Stern argues that he only continued the relationship because the young woman saw him as a "father figure," and because he wanted to help her. He argues, in essence, that he has met his burden of proof and his admission should be granted. We disagree.

Our prior cases regarding Bar admissions are clear with respect to the impact of a failure to honor financial obligations. In *Application of Hyland*, 339 Md. at 521, 663 A.2d at 1309,

we denied the admission to the Bar of a candidate who, prior to law school, pled guilty to fifteen counts of failure to remit sales taxes in violation of Pennsylvania state law and, in addition, failed to file federal employee withholding taxes, with regard to his operation of a restaurant. We noted that "[t]he conduct of an applicant in satisfying his or her financial obligations and exhibiting financial responsibility is an important factor in assessing good moral character," *id.* at 535, 663 A.2d at 1316, and that

> [g]iven the duties that attorneys are ordinarily required to perform, we think that the applicant's failure to carry out his significant legal obligation to satisfy his tax debt to the federal government and the Commonwealth of Pennsylvania is connected to his fitness to practice law. This conduct reflects adversely on the applicant's personal commitment to the proper administration of justice, as well as his honesty and truthfulness.

*Id.* at 538, 663 A.2d at 1317. We noted that Hyland's inability to honor his financial obligations adversely reflected upon his ability to practice law:

> We shall consider those character traits that relate to the applicant's present fitness to practice law and to the State's legitimate interest in protecting prospective clients and the system of justice. We believe the record shows that the applicant does not appreciate the fiduciary responsibility incumbent upon an attorney when entrusted with the monies of another person. He does not appreciate the analogy between the tax obligations and the client trust account responsibilities. In addition to his lack of candor and contradictory testimony on critical issues, the applicant has displayed an inability to recognize his dereliction of a moral duty.
>
> We believe that the applicant's failure to honor his financial obligations evidences a disregard of a legal obligation and reflects adversely on his fitness to practice law.

*Id.* at 536–37, 663 A.2d at 1316.

Also, in *Application of K.B.*, 291 Md. at 170, 434 A.2d at 541, we considered the application of K.B., who, on four

separate instances, applied for and obtained credit using ficti-
tious names and with which he made purchases totaling
$3,310.00; K.B. pled guilty, federally, to a single count of mail
fraud. We denied his admission to the Bar, noting that K.B.'s
conduct "reflect[ed] an intention not pay in accordance with
the terms of the credit accounts." *Id.* at 180, 434 A.2d at 546.
This, we stated, combined with the troubling fact that the
K.B.'s restitution payments were only made immediately prior
to applying for the Bar, reflected adversely on K.B.'s moral
character and fitness to practice law:

> In the present matter, we do not deal with a single trans-
> gression. Four separate fraudulent applications for credit
> accounts are involved. In the period between August 1974
> and K.B.'s arrest in November of 1975, $3,310 of purchases
> were charged to the fictitious name Amoco accounts. At
> the price of gasoline prevailing at that time, it is conserva-
> tive to estimate that in excess of 200 transactions had to
> have been involved.
>
> * * *
>
> After K.B.'s arrest in November of 1975 he continued to
> work for the title company until his sentencing in July of
> 1976. There is no indication that the applicant undertook to
> make any restitution during that period. The applicant
> testified he made a payment of several hundred dollars to
> Amoco prior to leaving for prison. Following his confine-
> ment, the applicant had been employed continuously since
> February of 1977, but he did not resume making any
> restitution until November 1977. The plan of partial resti-
> tution, which was acceptable to Amoco, was arranged by
> K.B.'s attorney in obvious preparation for the November
> 1977 hearing before the Board. We are far from convinced
> that the plan of partial restitution was prompted by a full
> and complete rehabilitation which occurred two years earli-
> er at the time of arrest. In the interval K.B. had passed the
> February 1977 written bar examination. This certainly
> created an incentive to attempt to neutralize the impedi-
> ment to admission of the fraud conviction.
>
> * * *

We glean from the record as a whole the very distinct impression that this applicant's past criminal problem resulted from the perceived necessity to maintain a desired level of social prestige which, in this case, involved operating a car, and from a willingness to risk violating serious criminal laws in order to do so. Every experienced practitioner knows of cases where an attorney has yielded to the temptation to "borrow" clients' funds entrusted to him because of the pressure to maintain a certain social status while waiting for some fees to come in. It is because of the great risk to the public in admitting to the Bar one who has exhibited this serious character flaw that we require the evidence of present moral fitness to "unequivocally demonstrate . . . full and complete rehabilitation."

*Id.* at 177–80, 434 A.2d at 545–46. *See also Application of Charles M.,* 313 Md. at 178–80, 545 A.2d at 12 (noting that the root of applicant's fraud by check scheme was that he was unable to maintain financial stability; admission was denied).

We iterated in those cases that an applicant's inability to honor his financial obligations, clearly, reflects adversely on the moral character and fitness needed to practice law, as it does in the case *sub judice.* Mr. Stern has shown a pattern of financial irresponsibility. He allowed his debt to escalate and made very few efforts, if any, to resolve his financial obligations *until* he was faced with the possibility that his failure could hinder his admission to the Bar.

The Committee also found that Mr. Stern knew that his debts had to be paid and that he had assets to do so, but instead, he continued to increase his debt until no one would extend him further credit. He clearly did not take responsibility to generate funds sufficient to pay his debts by limiting his spending and selling assets. On his personal financial statement, requested by the Character Committee, Mr. Stern listed savings of $21,500.00, two vehicles valued at $16,000.00, a bicycle worth $5,000.00, personal effects valued at $15,000.00, and $10,000.00 worth of artwork, many of which could have been avoided or sold to meet his debt load. When assets are juxtaposed against the judgments, it becomes clear that Mr.

Stern lived a lifestyle based on overdue credit and bad judgment.

Mr. Stern contends that unlike *Application of Hyland, Application of K.B.* and other cases in which we have denied admission, his conduct was not criminal. The fact that Mr. Stern was not the subject of criminal prosecution does not affect the fact that his financial misconduct does not bode well for someone who would be handling client funds as an attorney and in and of itself reflects adversely on his character and fitness to practice law.

■ Additionally, Mr. Stern was not candid in regard to his disclosures on his law school and Bar applications. We have been clear that, "it is a given that good moral character includes truthfulness and candor, and absolute candor is a requisite of admission to the Maryland Bar." *Application of Brown,* 392 Md. at 58, 895 A.2d at 1058. In that case, we denied the admission of an applicant, who on both his law school application and Bar application, omitted his federal conviction for bank fraud. *Id.* at 45–46, 895 A.2d at 1050–51. We have emphasized the importance of candor in all of the Bar application process. *See Application of Hyland,* 339 Md. at 539, 663 A.2d at 1317–18 (admission denied to applicant whose testimony before the Committee and the Board was marked by inconsistencies, contradictions, and evasiveness); *Application of K.B.,* 291 Md. at 180–81, 434 A.2d at 546 (noting apparent lack of candor on the part of the applicant when testifying before the Board because the testimony was inconsistent with the record). Mr. Stern, in his law school application, did not reveal the judgment entered in connection with his unpaid car loan with American General Finance. In response to various questions on his Bar application, Mr. Stern did not reveal several suits filed against him related to delinquent credit accounts, including those with American General Finance, First USA Bank, Citibank Visa and Universal Card; he did not disclose numerous accounts with which he had established credit, including American General Finance, Citibank Visa and Universal Card; finally, he did not

reveal a number of his delinquent accounts, including those with American General Finance, First USA Bank, Universal Card, Citibank Visa and Cingular Wireless.

Mr. Stern argues that he did not disclose the American General Finance judgment on his law school application because he was unaware of it and that he disclosed all of his financial information, eventually, to the Committee. We agree with the Committee and the Board that his explanations are unavailing. Clearly, Mr. Stern did not make a full disclosure in his Bar application, spurning his, as the Bar application provides, "duty to respond fully and candidly to each question or required disclosure and to ensure that my responses are accurate and current at all times until I am formally admitted to the Bar of the State of Maryland." Further, with respect to the American General Finance judgment, to believe Mr. Stern would require a complete lack of faith in the affidavit of the process server in that case averring that Mr. Stern had been served with the summons.

Mr. Stern argues, nevertheless, that he had been rehabilitated because he has admitted his mistakes, has adopted a financial plan and has paid most of his creditors. While these actions are commendable, Mr. Stern fails to acknowledge the antecedent for his change; he satisfied his creditors only from the resources of others, specifically, a loan from his mother and gifts received after his graduation. Moreover, we agree that absent the exigency of the Bar admission process, Mr. Stern likely would have continued to ignore his financial obligations to repay his debt. Mr. Stern had allowed his debts to increase, and made very few efforts, if any, to resolve his financial obligations, even when it appears he had the means to do so.

We also believe that Mr. Stern's moral character and fitness to practice law is impugned by his inappropriate relationship with a 15 year old female. Mr. Stern's testimony made it clear that the young woman was not emotionally mature enough to enter into, much less maintain, her relationship with Mr. Stern. He testified, however, that he continued his

relationship with her, which lasted for approximately seven or eight years, because the young woman saw him as a "father figure," and because he wanted to help. her. We agree with the Committee and the Board that these suggestions are inconsistent with his repeated remarks about how he was attracted to the woman, as well as with the fact that they had a sexual relationship.

### Conclusion

Therefore, after considering the totality of the circumstances surrounding Mr. Stern's conduct, and the fact that Mr. Stern bears the burden to prove his good moral character, our own independent review of the record leads us to conclude that Mr. Stern has failed to meet his burden, at this point in time, and his application for admission is denied.

**IT IS SO ORDERED.**